[No. S125171. Apr. 20, 2006.]

AMAANI LYLE, Plaintiff and Appellant, v.
WARNER BROTHERS TELEVISION PRODUCTIONS et al., Defendants
and Respondents.

269

COUNSEL

Mark Weidmann and Scott O. Cummings for Plaintiff and Appellant.

Law Offices of Jeffrey K. Winikow and Jeffrey K. Winikow for California Employment Lawyers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Russell K. Robinson for Law Professors Cynthia G. Bowman, Devon Carbado, Kimberlé Crenshaw, Laura Gomez, Cheryl Harris, Kenneth L. Karst, Charles J. Ogletree, Deborah L. Rhode, Dorothy E. Roberts, Russell K. Robinson, Leti Volpp, Adam Winkler, Kimberly A. Yuracko and Noah Zatz as Amici Curiae on behalf of Plaintiff and Appellant.

Patricia A. Shiu, Claudia Center, Shelley A. Gregory and Elizabeth Kristen for The Legal Aid Society-Employment Law Center, Asian Law Caucus,

California Women's Law Center and Equal Rights Advocates as Amici Curiae on behalf of Plaintiff and Appellant.

Mitchell Silberberg & Knupp, William L. Cole, Adam Levin, Douglas W. Bordewieck and Samantha C. Grant for Defendants and Respondents.

Loeb & Loeb, Douglas E. Mirell, Carla Feldman and Joseph Geisman for Feminists for Free Expression and Women's Freedom Network as Amici Curiae on behalf of Defendants and Respondents.

Horvitz & Levy and Frederic D. Cohen for Alliance of Motion Picture and Television Producers, Center for Individual Rights, the Foundation for Individual Rights in Education, Los Angeles Advertising Agencies Association, Motion Picture Association of America, Inc., the National Association of Scholars, Rubin Postaer and Associates and the Student Press Law Center Inc., as Amici Curiae on behalf of Defendants and Respondents.

Marshall M. Goldberg for the Writers Guild of America, West, Inc., The Directors Guild of America, the Screen Actors Guild, Sybil Adelman, Kate Angelo, John Auerbach, Ron Bass, John Beck, Steven Bochco, John Bowman, Yvette Lee Bowser, Sally Bradford, Pam Brady, John Brancato, Adam Brooks, James L. Brooks, J. Stewart Burns, James Burrows, Jason Cahill, Frank Kell Cahoon, Larry Charles, Joel Cohen, Jon Collier, Kevin Curran, Carlton Cuse, Larry David, Elias Davis, Nastaran Dibai, Marc Dube, Ted Elliot, Diane English, Mike Ferris, Greg Fitzsimmons, Terry Curtis Fox, John Furia, Jr., Shannon Gaughan, Will Gluck, Gary David Goldberg, Carl Gottlieb, Jeff Greenstein, Rick Groel, Ellen Guylas, Karen Hall, Charlie Hauck, Alex Herschlag, Jeffrey Hodes, David Isaacs, Gary Janetti, Al Jean, Chip Johannessen, Irma Kalish, Kourtney Kang, Nick Kazan, Barry Kemp, Laura Kightlinger, Robert King, John Kinnally, David Koepp, Pang-Ni Landrum, Dale Launer, Bill Lawrence, Norman Lear, Peter Lefcourt, Gail Lerner, Ken Levine, Tim Long, Don Mankiewicz, Myles Mapp, Jhoni Marchinko, Jeff Martin, Craig Mazin, Jeff Melvoin, Aaron Mendelsohn, Carol Mendelsohn, George Meyer, Joan Meyerson, David Milch, Miles Millar, Jay Moriarty, Theresa Mulligan, Bob Nickman, Peter Noah, Bill Odenkirk, Lawrence O'Donnell, Tim O'Donnell, Carolyn Omine, Daniel Palladino, J. Stanford Parker, Don Payne, Daniel Petrie, Jr., David Pollock, Elaine Pope, Tracy Poust, Michael Price, Max Pross, Matt Pyken, Tad Quill, Mike Reiss, Adam Rodman, Howard Rodman, Fred Rubin, Diane Ruggiero, Jeff Schaffer, James Schamus, Stephen Schiff, Tom Schulman, Lisa Seidman, Matt Selman, David Seltzer, Tom Shadyac, Ed Solomon, Jonathan Stark, Mark Stegemann, Doug Steinberg, Gardner Stern, Matt Stone, Kathy A. Stumpe, Rob Thomas, Scott Thompson, Mike Tollin, Patric Verrone, David Walpert, Matt Warburton, Sonja Warfield, Eric Weinberg, David Weiss, John Wells, Mike

White, Matthew Wickline, Larry Wilmore, Marc Wilmore, Terence Winter, Bill Wrubel and Elisa Zuritsky as Amici Curiae on behalf of Defendants and Respondents.

Sonnenschein Nath & Rosenthal, Michael A. Bamberger, Martin J. Foley and Mark T. Hansen for American Booksellers Foundation for Free Expression, Association of American Publishers, Inc., Comic Book Legal Defense Fund, Freedom to Read Foundation and Publishers Marketing Association as Amici Curiae on behalf of Defendants and Respondents.

Davis Wright Tremaine, Kelli L. Sager, Rochelle L. Wilcox; Thomas W. Newton; Lucy A. Dalglish; Harold L. Fuson, Jr., Judith Fanshaw; Karlene W. Goller; Peter Scheer; Levine Sullivan Koch & Schulz, James E. Grossberg; Cohn and Marks and Kevin M. Goldberg for California Newspapers Publishers Association, The Reporters Committee for Freedom of the Press, The Daily Journal Corporation, The Copley Press, Inc., Los Angeles Times Communications LLC, California First Amendment Coalition, Freedom Communications, Inc., and The American Society of Newspaper Editors as Amici Curiae on behalf of Defendants and Respondents.

Pillsbury Winthrop, Pillsbury Winthrop Shaw Pittman, George S. Howard, Alicia I. Mead; Law Offices of Steven Drapkin and Steven Drapkin for The Employers Group and The California Employment Law Council as Amici Curiae on behalf of Defendants and Respondents.

Law Offices of Manuel S. Klausner and Manuel S. Klausner for Individual Rights Foundation, Reason Foundation and Libertarian Law Council as Amici Curiae on behalf of Defendants and Respondents.

James E. Holst, Jeffery A. Blair and Christopher M. Patti for The Regents of the University of California as Amicus Curiae.

## OPINION

**BAXTER, J.**—Plaintiff was a comedy writers' assistant who worked on the production of a popular television show called *Friends*. The show revolved around a group of young, sexually active adults, featured adult-oriented sexual humor, and typically relied on sexual and anatomical language, innuendo, wordplay, and physical gestures to convey its humor. Before plaintiff was hired, she had been forewarned that the show dealt with sexual matters and that, as an assistant to the comedy writers, she would be listening to their sexual jokes and discussions about sex and transcribing the jokes and dialogue most likely to be used for scripts. After four months of employment,

plaintiff was fired because of problems with her typing and transcription. She then filed this action against three of the male comedy writers and others, asserting among other things that the writers' use of sexually coarse and vulgar language and conduct, including the recounting of their own sexual experiences, constituted harassment based on sex within the meaning of the Fair Employment and Housing Act (the FEHA) (Gov. Code, § 12900 et seq.; all further statutory references are to this code unless otherwise indicated).

The Court of Appeal reversed the trial court's order granting summary judgment on plaintiff's sexual harassment action. We granted review to address whether the use of sexually coarse and vulgar language in the workplace can constitute harassment based on sex within the meaning of the FEHA, and if so, whether the imposition of liability under the FEHA for such speech would infringe on defendants' federal and state constitutional rights of free speech.

█ Here, the record discloses that most of the sexually coarse and vulgar language at issue did not involve and was not aimed at plaintiff or other women in the workplace. Based on the totality of the undisputed circumstances, particularly the fact the *Friends* production was a creative workplace focused on generating scripts for an adult-oriented comedy show featuring sexual themes, we find no reasonable trier of fact could conclude such language constituted harassment directed at plaintiff because of her sex within the meaning of the FEHA. Furthermore, to the extent triable issues of fact exist as to whether certain offensive comments were made about women other than plaintiff because of their sex, we find no reasonable trier of fact could conclude these particular comments were severe enough or sufficiently pervasive to create a work environment that was hostile or abusive to plaintiff in violation of the FEHA. Accordingly, we remand the matter with directions to affirm the summary judgment order insofar as it pertains to plaintiff's sexual harassment action, without addressing the potential of infringement on defendants' constitutional rights of free speech.

FACTUAL AND PROCEDURAL BACKGROUND

After receiving a right to sue letter from the Department of Fair Employment and Housing, plaintiff Amaani Lyle filed this action against organizations and individuals involved in the production and writing of the popular adult-oriented *Friends* television show, including Warner Bros. Television Production (WBTV), NBC Studios (NBC), Bright, Kauffman, Crane Productions (BKC), and producers-writers Adam Chase, Gregory Malins, and Andrew Reich. Her first amended complaint alleged causes of action under the FEHA for race and gender discrimination, racial and sexual harassment, and retaliation for opposing race discrimination against African-Americans in the

casting of *Friends* episodes. The complaint also alleged common law causes of action for wrongful termination in violation of the public policies against race and gender discrimination and retaliation for complaining about race discrimination in violation of the FEHA.

After engaging in discovery, defendants moved for summary judgment and summary adjudication. The trial court granted the motion, ruling: (1) NBC and BKC were not plaintiff's employers and therefore were not liable on any FEHA cause of action; (2) plaintiff's FEHA harassment claims were time-barred; (3) plaintiff could not, in any event, factually establish her FEHA claims of race and gender discrimination, retaliation, or harassment as to any defendant; and (4) plaintiff could not establish her common law causes of action for wrongful termination in violation of public policy. The court entered judgment for all defendants and awarded them $21,131 in costs. In a postjudgment order, the court awarded defendants $415,800 in attorney fees on grounds that plaintiff's FEHA causes of action were "frivolous, unreasonable and without foundation."

The Court of Appeal affirmed the judgment in part and reversed it in part. Among other things, the court found defendants entitled to summary adjudication on plaintiff's FEHA and common law causes of action for termination based on race, gender, and retaliation, but concluded triable issues of fact existed as to her FEHA causes of action for sexual and racial harassment against defendants WBTV, BKC, Chase, Malins, and Reich. Accordingly, the court reversed the attorney fees award and vacated the award of costs for recalculation by the trial court to reflect the partial reversal of the judgment.

Both sides petitioned for review. We denied plaintiff's petition, but granted defendants' petition and ordered briefing and argument limited to the following issues: (1) Can the use of sexually coarse and vulgar language in the workplace constitute harassment based on sex within the meaning of the FEHA? and (2) Does the imposition of liability under the FEHA for sexual harassment based on such speech infringe on defendants' rights of free speech under the First Amendment to the federal Constitution or the state Constitution?

DISCUSSION

A. *Sexually Coarse and Vulgar Language*

There is no dispute that sexually coarse and vulgar language was used regularly in the *Friends* writers' room. But the use of sexually coarse and vulgar language in the workplace is not actionable per se. Rather, we must look to the specific facts and circumstances presented to determine whether

the language at issue constituted harassment based on sex within the meaning of FEHA and whether such language was severe enough or sufficiently pervasive to create a work environment that was hostile or abusive to plaintiff because of her sex.

### 1. *The Facts Presented in the Summary Judgment Proceeding*

Our first task is to determine whether the facts presented in the summary judgment proceeding were sufficient to establish a prima facie case of sexual harassment under the appropriate legal standards. We begin by reviewing the rules governing the summary judgment procedure.[1]

"A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); see also *id.*, § 437c, subd. (f) [summary adjudication of issues].) The moving party bears the burden of showing the court that the plaintiff 'has not established, and cannot reasonably expect to establish, a prima facie case . . . .' [Citation.]" (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460 [30 Cal.Rptr.3d 797, 115 P.3d 77] (*Miller*).) "[O]nce a moving defendant has 'shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established,' the burden shifts to the plaintiff to show the existence of a triable issue; to meet that burden, the plaintiff 'may not rely upon the mere allegations or denials of its pleadings . . . but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . .' [Citations.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476–477 [110 Cal.Rptr.2d 370, 28 P.3d 116].)

"On appeal from the granting of a motion for summary judgment, we examine the record de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party. [Citation.]" (*Miller, supra,* 36 Cal.4th at p. 460.)

Defendants' summary judgment motion relied on declarations from defendants Chase, Malins, Reich, and others, and other facts developed during discovery. These declarations and the deposition testimony of the parties and others disclosed that Chase, Malins, and Reich worked for defendant WBTV and were writers on the sixth production season of *Friends*. In June 1999, Malins and Chase, who also served as executive producers on the production,

---

[1] In this opinion, we review the trial court's order granting summary judgment only insofar as it pertains to plaintiff's sexual harassment claims; we do not review the order with regard to her racial harassment claims. Accordingly, our analysis addressing whether summary judgment was proper in this case should be understood in this context.

interviewed plaintiff, an African-American woman, for the position of writers' assistant for the *Friends* production. During the interview, they told plaintiff the show dealt with sexual matters and, as a result, the writers told sexual jokes and engaged in discussions about sex. Plaintiff responded that sexual discussions and jokes did not make her uncomfortable, and she subsequently was hired as a writers' assistant.

In her deposition, plaintiff testified she had no recollection of any employee on the *Friends* production ever saying anything sexually offensive about her directly to her. No one on the production ever asked her out on a date or sexually propositioned her. Likewise, no one ever demanded sexual favors of her or physically threatened her.

Plaintiff testified, however, that a number of offensive discussions and actions occurred in the writers' meetings she was required to attend. The writers regularly discussed their preferences in women and sex in general. Chase spoke of his preferences for blonde women, a certain bra cup size, "get[ting] right to sex" and not "mess[ing] around with too much foreplay." Malins had a love of young girls and cheerleaders. Some of the sex-based discussions occurred outside the writers' room, that is, in the breakroom and in the hallways.

Also during the writers' meetings, Malins constantly spoke of his oral sex experiences and told the group that when he and his wife fought, he would "get naked" and then they would never finish the argument. Malins had a "coloring book" depicting female cheerleaders with their legs spread open; he would draw breasts and vaginas on the cheerleaders during the writers' meetings. The book was left on his desk or sometimes on writers' assistants' desks. Malins frequently used a pencil to alter portions of the name "*Friends*" on scripts so it would read "penis." Malins also spoke of his fantasy about an episode of the show in which the *Friends* character "Joey" enters the bathroom while the character "Rachel" is showering and has his way with her. And, during each of the four months plaintiff worked on the *Friends* production, some writers made masturbatory gestures.

In addition, plaintiff heard the writers talk about what they would like to do sexually to different female cast members on *Friends*. Malins remarked to Chase that Chase could have "fucked" one of the actresses on the show a couple of years before, and the two constantly bantered about the topic and how Chase had missed his chance to do so. Chase, Malins, and Reich spoke demeaningly about another actress on the show, making jokes about whether she was competent in sexually servicing her boyfriend. They also referred to her infertility once and joked she had "dried twigs" or "dried branches in her vagina."

In their depositions, Chase, Malins, and Reich gave testimony that corroborated portions of plaintiff's allegations. Chase acknowledged he had discussed, while in the writers' room, his personal sexual experiences. Chase also confirmed that he and other writers discussed anal sex, and that he had gestured on occasion as if he were masturbating, but could not recall having done so when plaintiff was present. Malins and Reich admitted "blowjob stories" were told in the writers' room. Reich said he had pantomimed masturbation in the writers' room, sometimes as a way of indicating something was a waste of time. In the writers' room and sometimes elsewhere, Reich and other writers discussed oral sex and anal sex, and writers discussed their personal sexual conduct. Reich also acknowledged he and others altered inspirational sayings on a calendar, changing, for example, the word "persistence" to "pert tits" and "happiness" to "penis."

These writers and others also testified that, both before and after plaintiff was hired, sexually coarse and vulgar language was used in the writers' room in group sessions with both male and female participants present, and both male and female writers discussed their own sexual experiences to generate material for the show. Episodes of the show often featured sexual and anatomical language, innuendo, wordplay, and physical gestures to convey humor concerning sex, including oral sex, anal sex, heterosexual sex, gay sex, "talking dirty" during sex, premature ejaculation, pornography, pedophiles, and so-called threesomes.

In opposing defendants' summary judgment motion, plaintiff likewise relied on the parties' deposition testimony. She also submitted two of her own declarations, in which she reiterated and more particularly described the graphic nature of the writers' alleged comments and conduct.[2] Her declarations also referred to incidents she did not mention in her deposition. Most

[2] For example, plaintiff's declarations stated: Malins, Chase, and Reich "would say that what they liked was 'a woman with big tits who could give a blow job' "; the writers "would for hours on end make lewd and offensive drawings of women"; they "would also commonly sit around and bang their hands on the bottom of the desk to make it sound as though they were masturbating"; Malins would say "he gets to hang out with them [two of the actresses], get rich, dream about fucking them and yet nobody bothers him when he's out in public"; Malins told a story "about a woman that when she had his penis down her throat had a gag reflex" and Malins thought she "was going to throw-up" on it; the writers made plaintiff sit "around waiting to go home" while they "were sitting around pretending to masturbate and continually talking about schlongs"; Reich "said that [one actress's] pussy was full of dried up twigs and said that if her husband put his dick in her she'd break in two"; Chase told plaintiff "he could have 'fucked' " one of the actresses but said it is " 'not like she asked me to bang her in the ass' "; Chase mentioned on at least two occasions that "he would have liked to have anal sex with [the same actress]"; Chase "once rhetorically asked the group, of [one actress and her then boyfriend], 'do you think they fuck in the dressing room' "; and the "blatant use of obscene language and flagrant discussions about personal sex lives occurred at least four days per week while [she] worked on 'Friends' and continued up until at least two days before [her] termination."

significantly, she claimed for the first time that Chase, Malins, and Reich referred to women using gender-related epithets.[3]

In this court, defendants argue the facts shown in the summary judgment proceeding do not establish actionable harassment under the FEHA because: (1) use of sexual speech, standing alone, does not violate the FEHA's prohibition against harassment because of sex; and (2) the conduct did not amount to severe or pervasive conduct that altered the terms or conditions of plaintiff's employment.

### 2. *The FEHA and Its Prohibitions*

We now turn to a review of the FEHA and its prohibitions.

■ With certain exceptions not implicated here, the FEHA makes it an unlawful employment practice for an employer, "because of the . . . sex . . . of any person, . . . to discriminate against the person in compensation or in terms, conditions, or privileges of employment." (§ 12940, subd. (a).) Likewise, it is an unlawful employment practice for an employer, "because of . . . sex, . . . to harass an employee." (§ 12940, subd. (j)(1).) Under the statutory scheme, " 'harassment' because of sex" includes sexual harassment and gender harassment. (§ 12940, subd. (j)(4)(C).) These prohibitions represent a fundamental public policy decision regarding "the need to protect and safeguard the right and opportunity of all persons to seek and hold employment free from discrimination." (*Brown v. Superior Court* (1984) 37 Cal.3d 477, 485 [208 Cal.Rptr. 724, 691 P.2d 272]; see also *Mogilefsky v. Superior Court* (1993) 20 Cal.App.4th 1409, 1414 [26 Cal.Rptr.2d 116].)

■ As we recently explained, "the prohibition against sexual harassment includes protection from a broad range of conduct, ranging from expressly or impliedly conditioning employment benefits on submission to or tolerance of unwelcome sexual advances, to the creation of a work environment that is hostile or abusive on the basis of sex." (*Miller, supra,* 36 Cal.4th at p. 461.) Here, plaintiff does not contend defendants subjected her to unwelcome sexual

---

[3] In their reply brief on the merits, defendants urge us to disregard these particular "facts" because, among other things, plaintiff did not mention them in her deposition but first raised them in a declaration, dated December 20, 2001, that she filed in opposition to defendants' summary judgment motion. But defendants provide no information or record citations indicating what objections, if any, they made to that declaration or what evidentiary rulings the trial court made. Although defendants claim both the trial court and the Court of Appeal "properly disregarded" plaintiff's December 20, 2001 declaration, they do so without reference to the record and without addressing the existence or significance of a second declaration plaintiff filed, dated March 19, 2002, in which she refers to the same "facts," as well as others. Because defendants' evidentiary contentions in this court lack adequate argument and support, we shall not disregard the evidence concerning the reported use of gender-related epithets.

advances as a condition of employment; rather, she alleges defendants created a hostile or abusive work environment. For this type of claim, plaintiff need not show evidence of unwanted sexual advances. (*Id.* at pp. 461–462.)

■ According to regulations interpreting and implementing the FEHA, the prohibition against discrimination in employment because of sex is intended to guarantee that members of both sexes will enjoy equal employment benefits. (Cal. Code Regs., tit. 2, § 7290.6, subd. (b).) For purposes of the FEHA, an "[e]mployment benefit" specifically includes "provision of a discrimination-free workplace" (*id.*, § 7286.5, subd. (f)), which in turn is defined as "provision of a workplace free of harassment" (*id.*, § 7286.5, subd. (f)(3).)

Like the FEHA, title VII of the federal Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e et seq.) prohibits sexual harassment, making it an unlawful employment practice for an employer, among other things, "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" (42 U.S.C. § 2000e-2(a)(1).) Because the workplace environment is one of the terms, conditions, or privileges of employment, a plaintiff may establish a violation of Title VII by showing that discrimination because of sex has created a hostile or abusive work environment. (See *Meritor Savings Bank v. Vinson* (1986) 477 U.S. 57, 64–66 [91 L.Ed.2d 49, 106 S.Ct. 2399] (*Meritor*).) Thus, while the wording of Title VII and the FEHA differs in some particulars, both statutory schemes regard the prohibition against sexual harassment as part and parcel of the proscription against sexual discrimination, and "the antidiscriminatory objectives and overriding public policy purposes of the two acts are identical." (*Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511, 517 [76 Cal.Rptr.2d 547].)[4]

■ In light of these similarities, California courts frequently seek guidance from Title VII decisions when interpreting the FEHA and its prohibitions against sexual harassment. (*Miller, supra,* 36 Cal.4th at p. 463.) For instance, we agree "with the United States Supreme Court that, to prevail, an

---

[4] "Although the FEHA explicitly prohibits sexual harassment of employees, while Title VII does not, the two enactments share the common goal of preventing discrimination in the workplace. Federal courts agree with guidelines established by the Equal Employment Opportunity Commission (EEOC), the agency charged with administering Title VII, in viewing sexual harassment as constituting sexual discrimination in violation of Title VII. [Citation.] In language comparable to that found in the FEHA and in [Fair Employment and Housing Commission] regulations, federal regulatory guidelines define sexual harassment as including unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that has the 'purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.' (29 C.F.R. § 1604.11(a)(3) (2004).)" (*Miller, supra,* 36 Cal.4th at p. 463.)

employee claiming harassment based upon a hostile work environment must demonstrate that the conduct complained of was *severe enough or sufficiently pervasive* to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees *because of their sex.* (See *Aguilar v. Avis Rent A Car System, Inc.* [(1999)] 21 Cal.4th [121,] 130 [87 Cal.Rptr.2d 132, 980 P.2d 846] [(*Aguilar*)], relying upon *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 21 [126 L.Ed.2d 295, 114 S.Ct. 367] [(*Harris*)].)" (*Miller, supra,* 36 Cal.4th at p. 462, italics added.) As the high court explained, a workplace may give rise to liability when it "is permeated with 'discriminatory [sex-based] intimidation, ridicule, and insult,' [citation], that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]' " (*Harris, supra,* 510 U.S. at p. 21.)

■ Under Title VII, a hostile work environment sexual harassment claim requires a plaintiff employee to show she was subjected to sexual advances, conduct, or comments that were (1) unwelcome (see *Meritor, supra,* 477 U.S. at p. 68); (2) because of sex (*Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 80–81 [140 L.Ed.2d 201, 118 S.Ct. 998] (*Oncale*)); and (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment (*id.* at p. 81; *Meritor, supra,* 477 U.S. at p. 67). In addition, she must establish the offending conduct was imputable to her employer. (*Meritor, supra,* 477 U.S. at pp. 69–73.) California courts have adopted the same standard for hostile work environment sexual harassment claims under the FEHA. (See, e.g., *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 608 [262 Cal.Rptr. 842] (*Fisher*).)

Defendants argue the evidence shown in the summary judgment proceeding, even when liberally construed in plaintiff's favor, was insufficient to establish either that the alleged offending conduct was undertaken because of plaintiff's sex, or that the conduct was sufficiently severe or pervasive to alter the conditions of her employment. We address these two elements, and the sufficiency of the related facts, below.

### a. *Harassment Because of Sex*

■ In *Oncale, supra,* 523 U.S. 75, the United States Supreme Court explained that "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at '*discriminat*[*ion*] . . . because of . . . sex.' " (*Oncale, supra,* 523 U.S. at p. 80.) Consequently, the high court stated, "workplace harassment, even harassment between men and women, is [not] automatically discrimination because of sex merely because the words used have sexual content or connotations." (*Ibid.*) Rather, " '[t]he critical issue . . . is whether members of one sex are exposed to disadvantageous terms or

conditions of employment to which members of the other sex are not exposed.' " (*Ibid.*, quoting *Harris, supra,* 510 U.S. at p. 25 (conc. opn. of Ginsburg, J.).) This means a plaintiff in a sexual harassment suit must show "the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina*[*tion*] . . . because of . . . sex.' " (*Oncale, supra,* 523 U.S. at p. 81.)

■ For FEHA claims, the discrimination requirement has been phrased similarly: "To plead a cause of action for [hostile work environment] sexual harassment, it is 'only necessary to show that gender is a substantial factor in the discrimination, and that if the plaintiff "had been a man she would not have been treated in the same manner." ' [Citation.]" (*Accardi v. Superior Court* (1993) 17 Cal.App.4th 341, 348 [21 Cal.Rptr.2d 292] (*Accardi*); see *Birschtein v. New United Motor Manufacturing, Inc.* (2001) 92 Cal.App.4th 994, 1001 [112 Cal.Rptr.2d 347] [quoting *Accardi*].) Accordingly, it is the disparate treatment of an employee on the basis of sex—not the mere discussion of sex or use of vulgar language—that is the essence of a sexual harassment claim.

The Fair Employment and Housing Commission (FEHC) is the agency charged with administering the FEHA. Consistent with the FEHA's public policy objective to safeguard the right and opportunity of all persons to employment "without discrimination or abridgement on account of . . . sex" (§ 12920), the FEHC declares: "Employment practices should treat all individuals equally, evaluating each on the basis of individual skills, knowledge and abilities and not on the basis of characteristics generally attributed to [protected groups]." (Cal. Code Regs., tit. 2, § 7286.3.) According to the FEHC, "[t]he purpose of the law against discrimination in employment because of sex is to eliminate the means by which individuals of the female sex have historically been relegated to inferior jobs and to guarantee that in the future both sexes will enjoy equal employment benefits." (Cal. Code Regs., tit. 2, § 7290.6, subd. (b).)

■ In the context of sex discrimination, prohibited harassment includes "verbal, physical, and visual harassment, as well as unwanted sexual advances." (Cal. Code Regs., tit. 2, § 7291.1, subd. (f)(1).) In this regard, *verbal* harassment may include epithets, derogatory comments, or slurs on the basis of sex; *physical* harassment may include assault, impeding or blocking movement, or any physical interference with normal work or movement, when directed at an individual on the basis of sex; and *visual* harassment may include derogatory posters, cartoons, or drawings on the basis of sex. (Cal.

Code Regs., tit. 2, § 7287.6, subd. (b)(1)(A), (B) & (C); see *Miller, supra*, 36 Cal.4th at p. 461.) Decisions interpreting Title VII are in accord.[5]

■ Both FEHA and Title VII cases recognize that evidence of hostile, sexist statements is relevant to show discrimination on the basis of sex. (See *Accardi, supra*, 17 Cal.App.4th at pp. 348–349; accord, *Oncale, supra*, 523 U.S. at p. 80 [actionable hostile work environment may include harassment in such sex-specific and derogatory terms as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace];[6] cf. *Heyne v. Caruso* (9th Cir. 1995) 69 F.3d 1475, 1479 ["conduct tending to demonstrate hostility towards a certain group" is relevant to show discrimination against an employee who is a member of that group].) However, while the use of vulgar or sexually disparaging language may be relevant to show such discrimination, it is not necessarily sufficient, by itself, to establish actionable conduct.

The FEHC concluded in a precedential decision that a FEHA hostile work environment sexual harassment claim may be established where, among other things, a male employee constantly referred to a female employee using demeaning, gender-specific terms. (*Dept. Fair Empl. & Hous. v. Nulton* (Sept. 16, 2003) FEHC Dec. No. 03-10 [2003 WL 22733897, *4, *7] [recognizing the male employee's repeated use of "fucking bitch" and one-time use of "cunt" were severe, within the meaning of the FEHA, "given these sex-based terms' inherently degrading and demeaning nature"].) A number of Title VII decisions have reached similar conclusions. (E.g., *Steiner v. Showboat Operating Co.* (9th Cir. 1994) 25 F.3d 1459, 1463–1464 ["dumb fucking broads" and "fucking cunts"]; *Burns v. McGregor Electronic Industries, Inc.* (8th Cir. 1993) 989 F.2d 959, 964–965 [such vulgar and offensive epithets are " 'widely recognized as not only improper, but as intensely degrading' "]; *Andrews v. City of Philadelphia, supra*, 895 F.2d at p. 1485 ["pervasive use of derogatory and insulting terms relating to women generally and addressed to

---

[5] E.g., *Nichols v. Azteca Restaurant Enterprises, Inc.* (9th Cir. 2001) 256 F.3d 864, 869–870 (verbal abuse); *Gregory v. Daly* (2d Cir. 2001) 243 F.3d 687, 692–693 (allegations of demeaning and sexually demeaning comments and unwelcome physical contact of a sexual nature); *Andrews v. City of Philadelphia* (3d Cir. 1990) 895 F.2d 1469, 1485 (use of derogatory and insulting terms relating to women; posting of pornographic pictures in common areas and in the plaintiffs' personal work spaces); *Lipsett v. University of Puerto Rico* (1st Cir. 1988) 864 F.2d 881, 905 (sexually charged nicknames given to the plaintiff and other female residents; Playboy centerfolds displayed where residents took their meals and conducted meetings; misogynistic verbal attacks constantly made); *Bennett v. Corroon & Black Corp.* (5th Cir. 1988) 845 F.2d 104, 105–106 (display of obscene cartoons bearing the plaintiff's name).

[6] *Oncale* suggested a couple of other ways to show that harassing conduct constituted discrimination because of sex: (1) a plaintiff could offer evidence of "explicit or implicit proposals of sexual activity"; or (2) a plaintiff could "offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." (*Oncale, supra*, 523 U.S. at pp. 80–81.)

female employees personally may serve as evidence of a hostile environment"].) In these cases, there was no suggestion that male coworkers had been subjected to comparable gender-related epithets and sexist insults. (See *Steiner v. Showboat Operating Co., supra,* 25 F.3d at p. 1463 [while supervisor was indeed abusive to men, his abuse of women was different, relying on "sexual epithets, offensive, explicit references to women's bodies and sexual conduct"]; see also *Oncale, supra,* 523 U.S. at pp. 80–81 [discrimination may be shown by "direct comparative evidence" of alleged harasser's disparate treatment of sexes in a mixed-sex workplace].)

 On the other hand, a hostile work environment sexual harassment claim is not established where a supervisor or coworker simply uses crude or inappropriate language in front of employees or draws a vulgar picture, without directing sexual innuendos or gender-related language toward a plaintiff or toward women in general. (E.g., *Brown v. Henderson* (2d Cir. 2001) 257 F.3d 246, 250, 256 [coworkers' steady stream of obscene conversation and vile talk, posting of sexual pictures, and drawing of a vulgar picture, did not constitute harassment because of sex]; *Moore v. Grove North America, Inc.* (M.D.Penn. 1996) 927 F.Supp. 824, 830 [male supervisor's repeated use of offensive four-letter word to and in front of the plaintiff did not create a hostile work environment, where he also swore at her male counterparts and did not make sexual innuendos or use gender-related language toward the plaintiff or women in general].) In this connection, it has been cautioned the term "bitch" is not so sex-specific and derogatory that its mere use necessarily constitutes harassment because of sex. (*Galloway v. General Motors Service Parts Operations* (7th Cir. 1996) 78 F.3d 1164, 1168, rejected on other grounds in *National Railroad Passenger Corporation v. Morgan* (2002) 536 U.S. 101, 117, fn. 11 [153 L.Ed.2d 106, 122 S.Ct. 2061; see *Hocevar v. Purdue Frederick Co.* (8th Cir. 2000) 223 F.3d 721, 737 (opn. of Beam, C. J.) ["mere use of the word 'bitch,' without other evidence of sex discrimination, is not particularly probative of a general misogynist attitude"].)

Moreover, "comments that have the 'sexual charge of an Abbott and Costello movie' and that 'could [easily] be repeated on primetime television' are not the type that trigger Title VII liability. [Citation.]" (*Jackson v. Racine County* (E.D.Wis. Sept. 19, 2005 Nos. 02-C-936, 02-C-1262, 02-C-1263) 2005 WL 2291025, *7 [supervisor's comment that employee was a "good girl" who earned her discipline might be mean or unkind, but was not comparable to the type of demeaning slurs giving rise to actionable claims].)

b. *Conduct Sufficiently Severe or Pervasive to Create a Sexually Hostile Work Environment*

 As the United States Supreme Court has recognized, "[t]he prohibition of harassment on the basis of sex requires neither asexuality nor

androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment" and create a hostile or abusive work environment. (*Oncale, supra*, 523 U.S. at p. 81.) " '[W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances [including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' (*Harris v. Forklift Systems, Inc., supra*, 510 U.S. at p. 23.)" (*Miller, supra*, 36 Cal.4th at p. 462.) Therefore, to establish liability in a FEHA hostile work environment sexual harassment case, a plaintiff employee must show she was subjected to sexual advances, conduct, or comments that were *severe enough or sufficiently pervasive to alter the conditions of her employment and create a hostile or abusive work environment.* (*Miller, supra*, 36 Cal.4th at p. 462; *Fisher, supra*, 214 Cal.App.3d at p. 610; accord, *Oncale, supra*, 523 U.S. at p. 81; *Meritor, supra*, 477 U.S. at p. 67). Although annoying or "merely offensive" comments in the workplace are not actionable, conduct that is severe or pervasive enough to create an objectively hostile or abusive work environment is unlawful, even if it does not cause psychological injury to the plaintiff. (*Harris, supra*, 510 U.S. at pp. 21–22.)

In determining the severity of harassment, "[t]he United States Supreme Court has warned that the evidence in a hostile environment sexual harassment case should not be viewed too narrowly: '[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." [Citation.] . . . [T]hat inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. . . . The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensibility to social context, will enable courts and juries to distinguish between simple teasing or roughhousing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.' (*Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 81–82 [140 L.Ed.2d 201, 118 S.Ct. 998]; see also *Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511, 517–518 [76 Cal.Rptr.2d 547].)" (*Miller, supra*, 36 Cal.4th at p. 462.)

■ With respect to the pervasiveness of harassment, courts have held an employee generally cannot recover for harassment that is occasional, isolated, sporadic, or trivial; rather, the employee must show a concerted pattern of harassment of a repeated, routine, or a generalized nature. (*Aguilar, supra*, 21 Cal.4th at p. 131, relying on *Fisher, supra*, 214 Cal.App.3d at p. 610; accord, *Smith v. Northwest Financial Acceptance, Inc.* (10th Cir. 1997) 129 F.3d 1408,

1414 ["isolated incidents of harassment, while inappropriate and boorish, do not constitute pervasive conduct"].) That is, when the harassing conduct is not severe in the extreme, more than a few isolated incidents must have occurred to prove a claim based on working conditions. (See *Herberg v. California Institute of the Arts* (2002) 101 Cal.App.4th 142, 150–153 [124 Cal.Rptr.2d 1] [liability for sexual harassment may not be imposed based on a single incident that does not involve egregious conduct akin to a physical assault or the threat thereof]; *Walker v. Ford Motor Co.* (11th Cir. 1982) 684 F.2d 1355, 1359 [involving racial harassment consisting of racial slurs and racially offensive comments]; *Minority Police Officers Ass'n of South Bend v. City of South Bend* (N.D.Ind. 1985) 617 F.Supp. 1330, 1353 [same].) Moreover, when a plaintiff cannot point to a loss of tangible job benefits, she must make a " 'commensurately higher showing that the sexually harassing conduct was pervasive and destructive of the working environment.' " (*Fisher, supra,* 214 Cal.App.3d at p. 610, quoting *Jones v. Flagship Intern.* (5th Cir. 1986) 793 F.2d 714, 720.)

 To be actionable, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." (*Faragher v. Boca Raton* (1998) 524 U.S. 775, 787 [141 L.Ed.2d 662, 118 S.Ct. 2275]; see *Harris, supra,* 510 U.S. at pp. 21–22; *Beyda v. City of Los Angeles, supra,* 65 Cal.App.4th at pp. 518–519.) That means a plaintiff who subjectively perceives the workplace as hostile or abusive will not prevail under the FEHA, if a reasonable person in the plaintiff's position, considering all the circumstances, would not share the same perception. Likewise, a plaintiff who does not perceive the workplace as hostile or abusive will not prevail, even if it objectively is so.

One issue of particular relevance to this case concerns the parties' disagreement over whether or not plaintiff was a "victim" of the defendant writers' harassing conduct. As set forth below, a plaintiff may be a victim of sexually harassing conduct, even though it is not directed at her and instead is aimed at other women in the workplace, but the absence of direct harassment affects the showing she is required to make.

 "To state that an employee must be the direct victim of the sexually harassing conduct is somewhat misleading as an employee who is subjected to a hostile work environment is a victim of sexual harassment even though no offensive remarks or touchings are directed to or perpetrated upon that employee." (*Fisher, supra,* 214 Cal.App.3d at p. 610, fn. 8.) Generally, however, sexual conduct that involves or is aimed at persons other than the plaintiff is considered less offensive and severe than conduct that is directed at the plaintiff. (See *Gleason v. Mesirow Financial Inc.* (7th Cir. 1997) 118 F.3d

1134, 1144 ["the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff"]; *Black v. Zaring Homes, Inc.* (6th Cir. 1997) 104 F.3d 822, 826 [fact that most comments were not directed at the plaintiff weakened her harassment claim]; *Jackson v. Racine County* (E.D.Wis. 2005) 2005 WL 2291025, *7 [comments made to the plaintiffs about the appearance of other female employees bear less weight than the comments directed toward the plaintiffs themselves].) A hostile work environment sexual harassment claim by a plaintiff who was not personally subjected to offensive remarks and touchings requires "an even higher showing" than a claim by one who had been sexually harassed without suffering tangible job detriment: such a plaintiff must "establish that the sexually harassing conduct permeated [her] direct work environment." (*Fisher, supra*, 214 Cal.App.3d at p. 610.)

To meet this burden, the plaintiff generally must show that the harassment directed at others was in her immediate work environment, and that she personally witnessed it. (*Fisher, supra*, 214 Cal.App.3d at p. 611.) The reason for this is obvious: if the plaintiff does not witness the incidents involving others, "those incidents cannot affect . . . her perception of the hostility of the work environment." (*Beyda v. City of Los Angeles, supra*, 65 Cal.App.4th at p. 519.)[7]

In *Fisher, supra*, 214 Cal.App.3d 590, a case decided in the context of a demurrer, a plaintiff surgical nurse alleged a defendant physician had created a hostile work environment for her by his sexual harassment of other women employees in her presence. Although her allegations described in general terms what acts occurred and their location,[8] the Court of Appeal found them insufficient to establish a cause of action for environmental sexual harassment because they were "most conclusionary" regarding what conduct the plaintiff

---

[7] *Beyda v. City of Los Angeles* found that "a reasonable person may be affected by knowledge that other workers are being sexually harassed in the workplace, *even if he or she does not personally witness that conduct.*" (*Beyda, supra*, 65 Cal.App.4th at p. 519, italics added.) We need not address that conclusion in this case. Because plaintiff represented under penalty of perjury that she has personal knowledge of the incidents described in her declaration, we shall not assume plaintiff did not personally witness those incidents.

[8] In *Fisher*, the plaintiff's allegations concerning the defendant's acts included: " '[P]ulling nurses onto his lap, hugging and kissing them while wiggling, making offensive statements of a sexual nature, moving his hands in the direction of [a] woman's vaginal area, grabbing women from the back with his hands on their breasts or in the area of their breasts, picking up women and swinging them around, throwing a woman on a gurney, walking up closely behind a woman with movements of his pelvic area. [Ms. Fisher] saw him commit acts of sexual harassment against [three named] nurses. The acts were committed in hallways, the operating room, and the lunch room . . . from 1982 to 1986. None of the women welcomed the advances and indicated to [the defendant] they were offensive by moving away from him, avoiding him whenever possible, or telling him to stop. [The plaintiff] also was forced to hear [the defendant] make lewd remarks about the breasts of anesthetized female patients.' " (*Fisher, supra*, 214 Cal.App.3d at pp. 612–613.)

actually observed. (*Fisher*, at p. 613.) As a matter of fairness given the ease with which these claims can be made despite their serious nature, the court concluded, "a plaintiff should be required to plead sufficient facts to establish a nexus between the alleged sexual harassment of others, her observation of that conduct and the work context in which it occurred." (*Ibid.*) In explaining why it found the complaint deficient, the court observed the allegations gave no indication of the frequency, intensity, or timeliness with which the alleged acts occurred (e.g., "Did each alleged act occur once in four years" or "on a daily or weekly basis?" What alleged incidents occurred "within the FEHA's one-year statute of limitations (§ 12960)?"), and pled only a legal conclusion regarding the alleged lewd remarks. (*Fisher*, at pp. 613–614.) In sum, the court concluded, the plaintiff did "not sufficiently plead [she] was subjected to a pattern of pervasive sexual harassment." (*Id.* at p. 614.) In so holding, the court nonetheless deemed it prudent to allow the plaintiff to amend her complaint because the law it announced concerned a matter of first impression. (*Id.* at p. 622.)

### 3. *Sufficiency of Plaintiff's Factual Showing*

We now apply the governing legal principles to the record before us.

As indicated, a defendant moving for summary judgment meets its burden of showing that a cause of action has no merit by establishing that one or more elements of the cause of action cannot be established. (Code Civ. Proc., § 437c, subds. (a), (*o*)(1).)

Here, defendants met that burden in their moving papers. First, they pointed to plaintiff's concessions that none of the three male writers' offensive conduct involved or was aimed at her. Second, considering the totality of the circumstances, especially the nature of the writers' work, the facts largely forming the basis of plaintiff's sexual harassment action—(1) the writers' sexual antics, including their pantomiming of masturbation, their drawing in the cheerleader coloring book, their altering words on scripts and calendars to spell out male and female body parts, (2) their graphic discussions about their personal sexual experiences, sexual preferences, and preferences in women, and (3) their bragging about their personal sexual exploits with girlfriends and wives—did not present a triable issue whether the writers engaged in harassment "because of . . . sex." (§ 12940, subd. (j)(1).)

There is no dispute *Friends* was a situation comedy that featured young, sexually active adults and sexual humor geared primarily toward adults. Aired episodes of the show often used sexual and anatomical language, innuendo, wordplay, and physical gestures to create humor concerning sex, including oral sex, anal sex, heterosexual sex, gay sex, "talking dirty" during sex,

premature ejaculation, pornography, pedophiles, and "threesomes." The circumstance that this was a creative workplace focused on generating scripts for an adult-oriented comedy show featuring sexual themes is significant in assessing the existence of triable issues of facts regarding whether the writers' sexual antics and coarse sexual talk were aimed at plaintiff or at women in general, whether plaintiff and other women were singled out to see and hear what happened, and whether the conduct was otherwise motivated by plaintiff's gender.

Here, the record shows that the instances of sexual antics and sexual discussions identified above did not involve and were not aimed at plaintiff or any other female employee. It further confirms that such "nondirected" conduct was undertaken in group sessions with both male and female participants present, and that women writers on the *Friends* production also discussed their own sexual experiences to generate material for the show. That the writers commonly engaged in discussions of personal sexual experiences and preferences and used physical gesturing while brainstorming and generating script ideas for this particular show was neither surprising nor unreasonable from a creative standpoint. Indeed, plaintiff testified that, when told during her interview for the *Friends* position that "the humor could get a little lowbrow in the writers' room," she responded she would have no problem because previously she had worked around writers and knew what to expect. Although plaintiff contends the writers "sorely understated the actual climate" of the writers' room in her interview, these types of sexual discussions and jokes (especially those relating to the writers' personal experiences) did in fact provide material for actual scripts.[9] The fact that certain discussions did not lead to specific jokes or dialogue airing on the show merely reflected the creative process at work and did not serve to convert such nondirected conduct into harassment because of sex.[10]

Moreover, although plaintiff contended in her deposition that much of the three writers' vulgar discussions and conduct wasted her time, there was no indication the conduct affected the work hours or duties of plaintiff and her male counterparts in a disparate manner. Accordingly, while the conduct certainly was tinged with "sexual content" and sexual "connotations," a reasonable trier of fact could not find, based on the facts presented here, that

[9] Of course, explicit sexual references typically were replaced with innuendos, imagery, similes, allusions, puns, or metaphors in order to convey sexual themes in a form suitable for broadcast on network television. For example, "motherfucker" was replaced with "mother kisser," "testicles" with "balls," and "anal sex" with "in the stern."

[10] In her brief on the merits, plaintiff refers to evidence that Reich "once" looked straight at her when he told a joke where a woman was the brunt of a tampon joke. But the record discloses no facts indicating what the particular joke was or whether it was sexist, lewd, or degrading. Without more, this evidence fails to raise a triable issue of fact that the writers' coarse sexual talk and conduct involved, or was aimed at, plaintiff because of her gender.

" 'members of one sex [were] exposed to disadvantageous terms or conditions of employment to which members of the other sex [were] not exposed' " (*Oncale, supra,* 523 U.S. at p. 80), or that if plaintiff " ' "had been a man she would not have been treated in the same manner" ' " (*Accardi, supra,* 17 Cal.App.4th at p. 348).

The circumstances surrounding the nondirected sexual antics and sexual talk are plainly distinguishable from the circumstances concerning somewhat similar conduct found actionable in *Ocheltree v. Scollon Productions, Inc.* (4th Cir. 2003) 335 F.3d 325. In *Ocheltree,* a case involving employees working at a costume production shop, the record showed that the plaintiff's male coworkers engaged in a daily stream of sexually explicit discussions and conduct: they spoke in crude terms of their sexual exploits with their wives and girlfriends; they used a female-form mannequin to demonstrate sexual techniques; one sang a vulgar song to the plaintiff; and another showed the plaintiff a magazine with graphic photographs of men with pierced genitalia to get her reaction. (*Id.* at pp. 328–329.) In that case, the appellate court affirmed an award of compensatory damages to the plaintiff because "[a] reasonable jury could find that much of the sex-laden and sexist talk and conduct in the production shop was aimed at [the plaintiff] because of sex—specifically, that the men behaved as they did to make her uncomfortable and self-conscious as the only woman in the workplace." (*Id.* at pp. 332–333; see *id.* at p. 327.)

Unlike the situation presented in *Ocheltree,* the record here reflects a workplace where comedy writers were paid to create scripts highlighting adult-themed sexual humor and jokes, and where members of both sexes contributed and were exposed to the creative process spawning such humor and jokes. In this context, the defendant writers' nondirected sexual antics and sexual talk did not contribute to an environment in which women and men were treated disparately. Moreover, there was nothing to suggest defendants engaged in this particular behavior to make plaintiff uncomfortable or self-conscious, or to intimidate, ridicule, or insult her, as was the case in *Ocheltree.*

During the discovery process, plaintiff testified her FEHA claim additionally was predicated on what the writers said they would like to do sexually to the different female cast members on *Friends,* and jokes that defendant Chase had missed a sexual opportunity with one of the actresses. The writers also made demeaning comments about another of the actresses, asking whether she was competent in sexually servicing her boyfriend and remarking she probably had "dried twigs" or "dried branches" in her vagina.

Unlike the writers' nondirected conduct, these particular comments support at least an inference that certain women working on the production of

*Friends* were targeted for personal insult and derogation because of their sex, while the men working there were not. The question remains, however, whether the comments were sufficiently severe or pervasive to create a sexually hostile work environment.

The evidence in the summary judgment proceeding showed that plaintiff named the two actresses as the only women on the production about whom the writers specifically made these offensive sex-based comments. As far as the two actresses were concerned, the conduct was not severe or pervasive: no sexual assault, threat of assault, sexual propositioning, or unwelcome physical contact occurred; nor did the conduct amount to verbal abuse or harassment, inasmuch as the actresses were not even present to hear the writers' offensive remarks and, apparently, had no awareness of what had been said.

Because the derogatory comments did not involve plaintiff, she was obligated to set forth specific facts from which a reasonable trier of fact could find the conduct "permeated" her direct workplace environment and was " 'pervasive and destructive.' " (*Fisher, supra,* 214 Cal.App.3d at p. 610.) In this connection, plaintiff points to her deposition testimony that she was too appalled, mortified, and offended by these comments (and the other conduct complained of) to speak, and to her later declaration that the conduct caused her "severe distress." Other parts of her testimony, however, revealed she viewed the writers and their conduct as puerile and annoying, rather than extreme or destructive: she testified the writers' room was "like being in a junior high locker room" and described the writers as "pimply-faced teenagers" and "silly little boys" who engaged in "very juvenile, counterproductive behavior" when they "spen[t] their time doing drawings" in the cheerleader coloring book and "discussing lewd things." But even where seemingly contradictory testimony like this is offered regarding a plaintiff's subjective perceptions, courts will not hesitate to find in favor of a defendant where the record does not establish an objectively hostile work environment. (E.g., *Black v. Zaring Homes, Inc., supra,* 104 F.3d at pp. 824–826 [reversing a jury verdict in favor of the plaintiff where fact that most of the offensive comments at issue were not directed at her contributed to court's conclusion that the conduct was not sufficiently severe].)

Plaintiff acknowledged the writers made references to the one actress's fertility and the "dried branches in her vagina" on only one occasion. Plaintiff did not, however, offer specific facts regarding how often or on how many occasions the writers engaged in the graphic sexual jokes and talk about the other actress. Although plaintiff testified that, in the four months she worked on *Friends,* Malins and Chase constantly bantered about Chase's missed sexual opportunity with that actress, her declarations indicated that some of

more graphic comments were made only once or "at least twice." (See *ante*, fn. 2.) Without more, a reasonable trier of fact could not conclude that these reported comments concerning the two actresses "permeated" plaintiff's direct work environment, or that they were " 'pervasive and destructive of [that] environment,' " so as to allow recovery despite the fact plaintiff was not personally subjected to offensive remarks or touchings and did not suffer a tangible job detriment. (*Fisher, supra*, 214 Cal.App.3d at p. 610.)

In opposing defendants' summary judgment motion, plaintiff offered additional evidence of offensive gender-related language. Specifically, she submitted two declarations in which she claimed to have heard defendants Chase, Malins, and Reich refer to women who displeased them or made them mad as "cunts" and "bitches." (See *Steiner v. Showboat Operating Co., supra*, 25 F.3d at pp. 1463–1464; *Burns v. McGregor Electronic Industries, Inc., supra*, 989 F.2d at pp. 964–965; *Andrews v. City of Philadelphia, supra*, 895 F.2d at p. 1485.) But plaintiff made no claim the writers ever referred to her by those terms, either to her face or to others, and she gave no indication whether the writers used gender-related epithets with reference to men in comparable situations.[11]

Even when we consider this belated presentation of epithets in the workplace, we find it insufficient to warrant reversal of the summary judgment order. Plaintiff made only three brief references to the topic in her declarations,[12] and those references failed to set forth "specific facts showing that a triable issue of material fact exists" as to the objective severity or pervasiveness of the incidents. (Code Civ. Proc., § 437c, subd. (p)(2).) Although plaintiff was reasonably specific in describing the one telephone reference to Marta Kauffman, she otherwise was not, merely indicating the writers used the epithets when they were displeased or mad. The missing context is especially significant here, because one of the reported epithets ("bitch") was not a term that was necessarily misogynistic (see *Hocevar v. Purdue Frederick Co., supra*, 223 F.3d at p. 737 (opn. of Beam, C. J.)), or even unsuitable for broadcast television (see *Jackson v. Racine County, supra*, 2005 WL 2291025, *7). Indeed, in one *Friends* episode, the character "Chandler" addressed the

---

[11] Although plaintiff's evidence also showed the writers regularly referred to women's anatomies by certain vulgar terms, her evidence further disclosed the writers regularly referred to men's anatomies with comparable vulgar terms. No disparity of treatment on this point appears.

[12] The three references consisted of the following: "Greg Malins, Adam Chase and Andrew Reich would also use and refer to women as 'cunts[,'] but Marta Kauffman didn't approve of that word, so they wouldn't use it when she was in the room." "Adam Chase once called Mar[t]a Kauffman a cunt in a phone conversation with me on a weekend while I was at home." "Throughout the time I worked on 'Friends' Greg Malins, Adam Chase and Andrew Reich regularly referred to women that had displeased them or made them mad as bitches or cunts." In her deposition testimony, Kauffman affirmed that she hated the word "cunt," and that people did not use that term when she was in the room.

character "Monica" by that term. Additionally, plaintiff asserted the three writers used epithets "regularly" when they were displeased or mad, but she did not specify the number of times or the frequency with which this happened. Her vagueness about this point and the circumstances surrounding the incidents did not aid in showing that use of epithets contributed to an objectively abusive or hostile work environment.

Plaintiff's showing regarding her subjective perceptions of the epithet incidents also appeared deficient. Specifically, she acknowledged the writers refrained from using the word "cunt" around one woman, Kauffman, who expressly disapproved its use. Although Kauffman was an executive producer who wielded authority plaintiff did not have, plaintiff offered no facts showing that plaintiff (or others) ever complained about the epithets, or that she felt she could not complain (even to Kauffman), or that any complaint she made was ignored. (Cf. *Walker v. Ford Motor Co., supra,* 684 F.2d at p. 1359, fn. 2 [fact that many of the racial epithets were not directed at the plaintiff was not determinative where such offensive language often was used in the plaintiff's presence after he had voiced objections].) Moreover, plaintiff made no mention of the epithets in her deposition when asked at that time to identify all instances of the writers' conduct she claimed was harassing or offensive. Her declarations provided no explanation whatsoever for their belated disclosure in the summary judgment proceeding.

Considering the totality of the circumstances, whether we view the epithet evidence by itself, or in conjunction with the evidence of the actress-related comments, we are unable to conclude a reasonable trier of fact could, on the meager facts shown, find the conduct of the three male writers was sufficiently severe or pervasive to create a hostile work environment. (See *Kortan v. California Youth Authority* (9th Cir. 2000) 217 F.3d 1104, 1110–1111 [plaintiff could not show her supervisor's conduct was frequent, severe, or abusive enough to interfere unreasonably with her employment where he occasionally directed sexual insults at *other* female employees in her presence and where his offensive conduct toward her was concentrated on one occasion following a work dispute].)

In urging affirmance of the Court of Appeal judgment, plaintiff contends there is a triable issue of material fact as to whether the writers' offensive conduct was part of the creative process leading to scripts and a necessary part of their work, or whether it was undertaken purely for their own personal sexual gratification. In support of this point, she cites the evidence that defendants engaged in vulgar behavior outside of the writers' room, for example, in the hallways or near her desk. Additionally, some of the derogatory comments concerning the actresses occurred in the writers'

room.[13] In this regard, the Court of Appeal concluded: "to the extent defendants can establish the recounting of sexual exploits, real and imagined, the making of lewd gestures and the displaying of crude pictures denigrating women was within 'the scope of necessary job performance' and not engaged in for purely personal gratification or out of meanness or bigotry or other personal motives, defendants may be able to show their conduct should not be viewed as harassment."[14]

We agree with this passage insofar as it suggests the circumstances pertaining to an employer's type of work and to the job duties and responsibilities of a plaintiff and her alleged harassers are properly considered in determining whether the harassers said or did things because of the plaintiff's sex and whether the subject conduct altered the terms or conditions of employment. But summary judgment was proper here because, as demonstrated above, none of the offensive conduct complained of meets both the "because of sex" and "severe or pervasive" requirements for establishing a hostile work environment sexual harassment claim. (See *Oncale, supra,* 523 U.S. at p. 81 [in emphasizing the importance of social context in which particular behavior occurs and is experienced, the high court remarked in dictum that a professional football player's working environment is not severely or pervasively abusive if the coach engages in the unnecessary act of "smack[ing] him on the buttocks as he heads onto the field"].) That is, while the record conceivably reflects a triable issue of fact as to whether some of defendants' offensive comments were directed at women because of their sex and hence unnecessary to the work (i.e., the reported gender-related epithets and the comments involving the actresses), the facts plaintiff offered simply are insufficient to establish that any such conduct was severe enough or sufficiently pervasive to be actionable. Moreover, assuming arguendo the incidents taking place in the hallways somehow could be deemed unnecessary to the work generated inside the writers' room, there is no indication these other incidents involved or were aimed at plaintiff or any other female employee, or that they appeared materially different from the type of sexual joking and discussions occurring in the writers' room that actually led to material for scripts.

---

[13] Plaintiff points to evidence she was told to *not* take notes about these and the other discussions at issue, and the fact that none of her notes from the show reflects such discussions.

[14] In support of this reasoning, the Court of Appeal relied on decisions that, in the specific context of determining who may be held liable for discrimination under the FEHA, described harassment as consisting " 'of conduct outside the scope of necessary job performance, conduct presumably engaged in for personal gratification, because of meanness or bigotry, or for other personal motives.' " (*Reno v. Baird* (1998) 18 Cal.4th 640, 643, 646 [76 Cal.Rptr.2d 499, 957 P.2d 1333] [quoting *Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 63 [53 Cal.Rptr.2d 741], and holding that the FEHA, like Title VII, allows plaintiffs to sue and hold liable their employers for discrimination, but not their supervisors as individuals].)

In reaching a contrary conclusion, the Court of Appeal relied on a number of authorities for the proposition that evidence of misogynistic, demeaning, offensive, obscene, sexually explicit, and degrading words and conduct in the workplace is relevant to prove environmental sexual harassment. (E.g., *Kotcher v. Rosa and Sullivan Appliance Center, Inc.* (2d Cir. 1992) 957 F.2d 59; *Lipsett v. University of Puerto Rico, supra*, 864 F.2d 881; *Robinson v. Jacksonville Shipyards, Inc.* (M.D.Fla. 1991) 760 F.Supp. 1486; see also *Ways v. City of Lincoln* (8th Cir. 1989) 871 F.2d 750.) We have no quarrel with that proposition, but those authorities do not support reversal of the summary judgment granted in this case. To the extent the courts in those cases found evidence sufficient to sustain a claim of a hostile work environment sexual harassment, such evidence included incidents that were directed at the plaintiff and circumstances that were discernibly more severe or pervasive than those at issue here.

*Kotcher v. Rosa and Sullivan Appliance Center, Inc., supra*, 957 F.2d 59, for example, involved evidence that a male supervisor commented on one plaintiff's bodily "equipment," and made numerous comments about the breasts of another plaintiff and left bruises on her arm on one occasion when he grabbed her. He often also pretended to masturbate and ejaculate at the two plaintiffs behind their backs to express his anger with them, often in front of others at the workplace. (*Id.* at p. 61.)

*Lipsett v. University of Puerto Rico, supra*, 864 F.2d 881, found the plaintiff established a prima facie case of hostile work environment by presenting, inter alia, evidence of a barrage of commentary by male residents that women in general, and that the plaintiff in particular, should not be surgeons; repeated and unwelcome sexual advances made to the plaintiff by two doctors; the plastering of degrading pinups—including Playboy center-folds, a sexually explicit drawing of the plaintiff's body, and a list of sexually charged nicknames of female residents—on the walls of the male residents' rest facility; and the sexually demeaning nickname given to the plaintiff. (*Id.* at pp. 903–905 [relying on Title VII law in action alleging violations of, inter alia, title IX of the Education Amendments of 1972 (20 U.S.C. § 1681)].)

In *Robinson v. Jacksonville Shipyards, Inc., supra*, 760 F.Supp. 1486, the plaintiff, a shipyard worker, presented evidence that she suffered nonsexual harassing behavior, including verbal abuse and shunning, because she was a female; incidents of directed sexual behavior both before and after she lodged complaints about the posting of numerous sexually oriented and pornographic pictures of nude and partially nude women in various work areas; and visual assault from the posting of the pictures themselves, which were dispropor-tionately offensive or demeaning to women and sexualized the work environment to the detriment of all female employees. (*Id.* at p. 1523.)

Finally, *Ways v. City of Lincoln, supra,* 871 F.2d 750, affirmed a finding of a racially hostile work environment where a plaintiff police officer offered a nonexhaustive list of 50 examples of specific racially offensive slurs, jokes, comments, and cartoons directed either to him or to Blacks and American Indians in general in his 16 years at a police department. (*Id.* at pp. 753–755.)

A case plaintiff relies on, *White v. New Hampshire Dept. of Corrections* (1st Cir. 2000) 221 F.3d 254, is of the same ilk. *White* expressly observed that "[t]he plaintiff pointed to numerous comments made by other employees *either to or about her* which were 'sufficiently severe or pervasive to alter the conditions of [her] employment,' " including sexual remarks and innuendos accusing her of having a sexual affair with an inmate, as well as daily sexual conversations and jokes that involved and were directed to her. (*White,* at pp. 260–261, italics added.)

Nor does *Fisher, supra,* 214 Cal.App.3d 590, support reversal of the summary judgment. As indicated, the Court of Appeal in that case held the plaintiff's allegations insufficient to state a FEHA cause of action for environmental sexual harassment, but allowed the plaintiff to amend her complaint because the requirements it announced concerned a matter of first impression. (*Fisher,* at p. 622.) Plaintiff's lack of specificity in the summary judgment proceeding here does not warrant similar leniency. The standards governing the "because of sex" and "severe or pervasive" requirements for this type of action were not uncertain at the time of defendants' motion. (*Miller, supra,* 36 Cal.4th at p. 462, and cases cited.) Likewise, there was no confusion regarding the plaintiff's burden in opposing a summary judgment motion to "set forth the specific facts showing that a triable issue of material fact exists" as to her cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).)

## B. *Constitutional Rights of Free Speech*

In affirming the grant of summary judgment in favor of defendants, we have concluded plaintiff's factual showing of the writers' sexually coarse and vulgar language does not establish a prima facie case of hostile work environment sexual harassment. In light of that conclusion, we have no occasion to determine whether liability for such language might infringe on defendants' rights of free speech under the First Amendment to the federal Constitution or the state Constitution. (Accord, *DeAngelis v. El Paso Mun. Police Officers Ass'n* (5th Cir. 1995) 51 F.3d 591, 596–597.)

CONCLUSION AND DISPOSITION

When we apply the legal principles governing sexual harassment claims, and give plaintiff the benefit of the rules governing review of summary

judgment orders, we conclude defendants have shown that plaintiff has not established, and cannot reasonably expect to establish, a prima facie case of hostile workplace environment sexual harassment.

In reaching this conclusion, we do not suggest the use of sexually coarse and vulgar language in the workplace can never constitute harassment because of sex; indeed, language similar to that at issue here might well establish actionable harassment depending on the circumstances. Nor do we imply that employees generally should be free, without employer restriction, to engage in sexually coarse and vulgar language or conduct at the workplace. We simply recognize that, like Title VII, the FEHA is "not a 'civility code' and [is] not designed to rid the workplace of vulgarity." (*Sheffield v. Los Angeles County Dept. of Social Services* (2003) 109 Cal.App.4th 153, 161 [134 Cal.Rptr.2d 492]; accord, *Oncale, supra*, 523 U.S. at p. 81.) While the FEHA prohibits harassing conduct that creates a work environment that is hostile or abusive on the basis of sex, it does not outlaw sexually coarse and vulgar language or conduct that merely offends.

We remand the matter to the Court of Appeal with directions to affirm the summary judgment insofar as it pertains to plaintiff's sexual harassment cause of action and for further proceedings consistent with the views expressed herein. In this regard, we observe the Court of Appeal concluded defendants' challenges to plaintiff's racial harassment cause of action were lacking in merit at least partly for the reasons it concluded their sexual harassment contentions were lacking in merit. We direct the Court of Appeal to reconsider and decide all issues in a manner consistent with the instant opinion, including those related to the racial harassment cause of action and those respecting the attorney fees award.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**CHIN, J.,** Concurring.—I agree that the trial court properly granted summary judgment in favor of defendants under the relevant statutes. I write separately to explain that any other result would violate free speech rights under the First Amendment of the United States Constitution and its California counterpart, article I, section 2 of the California Constitution (hereafter collectively the First Amendment).

This case has very little to do with sexual harassment and very much to do with core First Amendment free speech rights. The writers of the television show, *Friends*, were engaged in a *creative process*—writing adult comedy—when the alleged harassing conduct occurred. The First Amendment

protects creativity. (*Winter v. DC Comics* (2003) 30 Cal.4th 881, 888, 891 [134 Cal.Rptr.2d 634, 69 P.3d 473].) *Friends* was entertainment, but entertainment is fully entitled to First Amendment protection. "There is no doubt that entertainment, as well as news, enjoys First Amendment protection." (*Zacchini v. Scripps-Howard Broadcasting Co.* (1977) 433 U.S. 562, 578 [53 L.Ed.2d 965, 97 S.Ct. 2849]; see also *Joseph Burstyn, Inc. v. Wilson* (1952) 343 U.S. 495, 501–502 [96 L.Ed. 1098, 72 S.Ct. 777] [First Amendment protects motion pictures].) " '[T]he constitutional guarantees of freedom of expression apply with equal force to the publication whether it be a news report or an entertainment feature.' " (*Gates v. Discovery Communications, Inc.* (2004) 34 Cal.4th 679, 695 [21 Cal.Rptr.3d 663, 101 P.3d 552].) Scripts of the *Friends* show " 'are no less protected because they provide humorous rather than serious commentary.' " (*Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 406 [106 Cal.Rptr.2d 126, 21 P.3d 797].)

We have found that the First Amendment protects even threatening speech that does not rise to a criminal threat. (*In re George T.* (2004) 33 Cal.4th 620 [16 Cal.Rptr.3d 61, 93 P.3d 1007] [dark poetry in school].) Similarly, we should protect the creative speech here. I do not suggest that the First Amendment protects all sexually harassing speech. Just as the First Amendment does not protect criminal threats (*In re George T., supra*, 33 Cal.4th at p. 630; *People v. Toledo* (2001) 26 Cal.4th 221, 228–229 [109 Cal.Rptr.2d 315, 26 P.3d 1051]), so too may the state proscribe sexual harassment. But the proscription must be carefully tailored to avoid infringing on First Amendment free speech rights in the creative process.

Balancing the compelling need to protect employees from sexual harassment with free speech rights can, in some contexts, present very difficult questions. For example, a potential, and sometimes real, tension between free speech and antiharassment laws exists even in the ordinary workplace. (See, e.g., *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 131, fn. 3, 136–137, fn. 5 [87 Cal.Rptr.2d 132, 980 P.2d 846] (*Aguilar*); see also *id.* at pp. 147–169 (conc. opn. of Werdegar, J.); *id.* at pp. 169–176 (dis. opn. of Mosk, J.); *id.* at pp. 176–189 (dis. opn. of Kennard, J.); *id.* at pp. 189–196 (dis. opn. of Brown, J.).) Debating these issues has kept academia occupied. (See, e.g., Volokh, *Freedom of Speech and Workplace Harassment* (1992) 39 UCLA L.Rev. 1791 (Volokh) [generally defending free speech against harassment laws unless the hostile speech is directed towards the plaintiff]; Sangree, *Title VII Prohibitions Against Hostile Environment Sexual Harassment and the First Amendment: No Collision in Sight* (1995) 47 Rutgers L.Rev. 461 [generally defending antiharassment laws against First Amendment attack and disagreeing with much of Professor Volokh's argument]; Volokh, *How Harassment Law Restricts Free Speech* (1995) 47 Rutgers L. Rev. 563 [Professor Volokh's response to Professor Sangree];

McGowan, *Certain Illusions About Speech: Why the Free-Speech Critique of Hostile Work Environment Harassment Is Wrong* (2002) 19 Const. Comment. 391 (McGowan) [generally defending antiharassment laws against First Amendment attack]; see also *Aguilar, supra,* at pp. 136–137, fn. 5.)

But the issue here is quite different. In *Aguilar, supra,* 21 Cal.4th 121, the workplace was a car rental company. Creative expression was not the company's product. Here, by contrast, the product, a comedy show, was itself expression. Questions regarding free speech rights in the ordinary workplace—where speech is not an integral part of the product—can be difficult, as the five separate opinions in *Aguilar* attest. I need not, and do not, go into these questions here, because this case presents an entirely different and, to my mind, rather straightforward constitutional question. When, as here, the workplace product is the creative expression itself, free speech rights are paramount. The *Friends* writers were not renting cars and talking about sex on the side. They were writing adult comedy; sexual repartee was an integral part of the process.

Lawsuits like this one, directed at restricting the creative process in a workplace *whose very business is speech related,* present a clear and present danger to fundamental free speech rights. Even academics who generally defend antiharassment law against First Amendment attack recognize the importance of defending the First Amendment in a context like this. (E.g., McGowan, *supra,* 19 Const. Comment. at pp. 393, 425–431 [concluding, on p. 431, "In expressive workplaces that foster, support, and encourage debate, discussion, and plural opinions, the First Amendment insulates much more."].)

For example, Professor McGowan contrasts two workplace situations involving the display of Playboy Magazine centerfolds: (1) at a shipyard where only one woman is employed as a welder, and (2) in a museum where centerfolds were displayed "to document changes in American visions of female beauty." (McGowan, *supra,* 19 Const. Comment. at p. 391.) McGowan argues that free speech rights must yield to antiharassment law in the first case. But she agrees that the museum is an expressive workplace and, as such, is entitled to First Amendment protection. This case is like the second situation, not the first. As Professor Volokh explains, the free speech problem is especially serious "if the speech that creates the hostile work environment is an inherent part of the employer's business." (Volokh, *supra,* 39 UCLA L.Rev. at p. 1853.) "It seems clear that, say, a female employee of an art gallery—or a female employee of an adult bookstore—cannot claim that sexually explicit materials in the workplace are creating a hostile work environment." (*Id.* at p. 1861.)

The writers here did at times go to extremes in the creative process. They pushed the limits—hard. Some of what they did might be incomprehensible

to people unfamiliar with the creative process. But that is what creative people sometimes have to do. As explained in an amicus curiae brief representing the Writers Guild of America, West, Inc.; the Directors Guild of America; the Screen Actors Guild; and 131 named individuals representing a "who's who" of television and motion picture writers and directors (hereafter the Writers Guild brief), "the process creators go through to capture the necessary magic is inexact, counterintuitive, nonlinear, often painful—and above all, delicate. And the problem is even more complicated for group writing." "Group writing," the brief explains, "requires an atmosphere of complete trust. Writers must feel not only that it's all right to fail, but also that they can share their most private and darkest thoughts without concern for ridicule or embarrassment or legal accountability." The brief quotes Steven Bochco, cocreator of *Hill Street Blues*, *L.A. Law*, and *NYPD Blue*, and one of the individuals the brief represents, as explaining that a "certain level of intimacy is required to do the work at its best, and so there is an implicit contract among the writers: what is said in the room, stays in the room." The brief further explains that "with adult audiences in particular, the characters, dialogue, and stories must ring true. That means on shows like *Law and Order*, *ER*, or *The Sopranos*, writers must tap into places in their experience or psyches that most of us are far too polite or self-conscious to bring up."

The creative process must be unfettered, especially because it can often take strange turns, as many bizarre and potentially offensive ideas are suggested, tried, and, in the end, either discarded or used. As the Writers Guild brief notes, "*All in the Family* pushed the limits in its day, but with race rather than sex." The brief quotes Norman Lear, *All in the Family*'s creator, and another of the individuals on whose behalf the brief was filed, as saying, "We were dealing with racism and constantly on dangerous ground. . . . We cleaned up a lot of what was said in the room, and some people *still* found it offensive." It is hard to imagine *All in the Family* having been successfully written if the writers and others involved in the creative process had to fear lawsuits by employees who claimed to be offended by the process of discovering what worked and did not work, what was funny and what was not funny, that led to the racial and ethnic humor actually used in the show.

"[S]peech may not be prohibited because it concerns subjects offending our sensibilities." (*Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 245 [152 L.Ed.2d 403, 122 S.Ct. 1389].) We must not permit juries to dissect the creative process in order to determine what was *necessary* to achieve the final product and what was not, and to impose liability for sexual harassment for that portion deemed unnecessary. Creativity is, by its nature, creative. It is unpredictable. Much that is not obvious can be necessary to the creative process. Accordingly, courts may not constitutionally ask whether challenged speech was necessary for its intended purpose. (*Shulman v. Group W.*

*Productions, Inc.* (1998) 18 Cal.4th 200, 229 [74 Cal.Rptr.2d 843, 955 P.2d 469].) "The courts do not, and constitutionally could not, sit as superior editors of the press." (*Ibid.*)

For this reason, it is meaningless to argue, as plaintiff does, that much of what occurred in this process did not make its way into the actual shows. The First Amendment also protects attempts at creativity that end in failure. That which ends up on the cutting room floor is also part of the creative process. An amicus curiae brief representing, among others, the American Booksellers Foundation for Free Expression explains: "To require the participants to justify after the fact the 'necessity' of minor segments of the creative process represents a misunderstanding of the creative process. That process usually includes many dead ends that are not reflected in the final work. But the dead ends are part of creating the final work; the fact that one approach or suggestion is not productive is part of the process of creatively reaching end result. In that sense the dead ends, as well as everything else in the creative process, are necessary."

The Writers Guild brief explains it similarly. "[T]he creative person tr[ies] one notion after another before coming up with the final product. Writers are like scavengers and get their ideas wherever they can: 'Ninety percent of everything doesn't work,' says Lear, 'That's why it's so hard, that's why you spend so much time there.' . . . Lear puts it this way: 'There were things we said we would never print. That's true of racism or any touchy subject. That's what it takes to make a great show: smart people sitting in a room, going wherever they want.' " As that brief notes, "It is impossible to imagine how writers, directors, and actors could work together if they had to worry about doing only what was 'creatively necessary' in order not to offend a worker on the set."

Does this mean that anything that occurs while writing a television show is permissible? Do employees involved in that process receive no protection? Of course not. Just as criminal threats are not protected, just as no one has the right to falsely shout "fire" in a crowded theater, limits exist as to what may occur in the writers' room. I agree with Professor Volokh that, even in this context, speech that is *directed*, or "aimed at a particular employee because of her race, sex, religion, or national origin," is not protected. (Volokh, *supra*, 39 UCLA L.Rev. at p. 1846.) "The state interest in assuring equality in the workplace would justify restricting directed speech . . . ." (*Ibid.*) Speech directed towards plaintiff *because* of her sex could not further the creative process.

Accordingly, I agree with the general test proposed in the amicus curiae brief of the California Newspaper Publishers Association et al.: "Where, as

here, an employer's product is protected by the First Amendment—whether it be a television program, a newspaper, a book, or any other similar work—the challenged speech should not be actionable if the court finds that the speech arose in the context of the creative and/or editorial process, and it was not directed at or about the plaintiff."

This test presents the proper balance. Often, free speech cases involve the very difficult balancing of important competing interests. But here, in the creative context, free speech is critical while the competing interest— protecting employees involved in the creative process against offensive language and conduct *not directed at them*—is, in comparison, minimal. Neither plaintiff nor anyone else is required to become part of a creative team. But those who choose to join a creative team should not be allowed to complain that some of the creativity was offensive or that behavior not directed at them was unnecessary to the creative process.

When First Amendment values are at stake, summary judgment is a favored remedy. " '[B]ecause unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable. [Citation.] Therefore, summary judgment is a favored remedy [in such cases] . . . .' " (*Shulman v. Group W Productions, Inc.*, *supra*, 18 Cal.4th at p. 228.) " 'To any suggestion that the outer bounds of liability should be left to a jury to decide we reply that in cases involving the rights protected by the speech and press clauses of the First Amendment the courts insist on judicial control of the jury.' " (*Ibid.*) "While the crucial test as to whether to grant a motion for summary judgment remains the same in free speech cases (i.e., whether there is a triable issue of fact presented in the case), the courts impose more stringent burdens on one who opposes the motion and require a showing of high probability that the plaintiff will prevail in the case. In the absence of such showing the courts are inclined to grant the motion and do not permit the case to proceed beyond the summary judgment stage [citations]." (*Sipple v. Chronicle Publishing Co.* (1984) 154 Cal.App.3d 1040, 1046–1047 [201 Cal.Rptr. 665].)

Indeed, cases like this, arising in a creative context, often can and should be decided on demurrer. (*Winter v. DC Comics*, *supra*, 30 Cal.4th at pp. 891–892.) Because even the taking of depositions could significantly chill the creative process, by destroying the mutual trust and confidentiality necessary to writing television shows like *Friends*, courts should independently review the allegations to ensure that First Amendment rights are not being violated. (See *In re George T.*, *supra*, 33 Cal.4th at pp. 631–632 [independent judicial review necessary when First Amendment interests are at stake].) If the complaint does not allege that the offending conduct was pervasive and *directed at the plaintiff*, and include specific supporting facts

that, if true, would establish those allegations, the court should grant a demurrer. The threat of litigation must not be permitted to stifle creativity.

We must "[a]lways remember[] that the widest scope of freedom is to be given to the adventurous and imaginative exercise of the human spirit . . . ." (*Kingsley Pictures Corp. v. Regents* (1959) 360 U.S. 684, 695 [3 L.Ed.2d 1512, 79 S.Ct. 1362] (conc. opn. of Frankfurter, J.).) We must not tolerate laws that "lead to timidity and inertia and thereby discourage the boldness of expression indispensable for a progressive society." (*Ibid.*) The allegedly offending conduct in this case arose out of the protected creative process and was not directed at plaintiff. Accordingly, the trial court properly granted summary judgment in defendants' favor. The First Amendment demands no less.