Filed 8/14/20  Wheat v. City of Corona CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| JOSEPH WHEAT, | |
| Plaintiff and Appellant, | E072242 |
| v. | (Super.Ct.No. RIC1717186) |
| CITY OF CORONA, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County.  Randall S. Stamen, Judge.  Affirmed.

Law Offices Of Brad Husen, Brad J. Husen and Jake Husen for Plaintiff and Appellant.

Dean Derleth, City Attorney, John D. Higginbotham, Assistant City Attorney for Defendant and Respondent.

1

Joseph Wheat (Wheat) sued the City of Corona (the City) for injuries suffered due to an alleged dangerous condition of public property. The City moved for summary judgment. The trial court granted the motion. Wheat contends the trial court erred by granting summary judgment because there are triable issues of material fact. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

### A.     COMPLAINT

In Wheat's complaint he alleged the following: "[Wheat] was injured in a trip and fall incident that occurred in the City of Corona on Promanade [*sic*] Avenue. [Wheat] was walking on the sidewalk when suddenly and without warning, he tripped and fell over a dark green water valve that was located in the middle of the sidewalk in an area that was not well lit." Wheat alleged the City had actual or constructive knowledge of the existence of the dangerous condition and that the condition was created by City employees. Wheat alleged he suffered lost wages, hospital and medical expenses, general damages, and a loss of earning capacity.

### B.     MOTION FOR SUMMARY JUDGMENT

The City moved for summary judgment. The City provided the following factual history: "On April 21, 2017, sometime after 9:00 p.m., . . . Wheat was walking near his residence along a sidewalk on the north side of South Promenade Avenue just west of the intersection of Promenade and Collett Avenue ('Premises'), when he allegedly tripped over an Air/Vacuum ('Airvac') situated in the sidewalk ('Incident'). [Citation.]

2

"Airvacs are located near the high point in a clean water main and used to allow air to be exhausted from or admitted into the water main as it is being filled or drained. [Citation.] It is not unusual for an airvac to be situated in a sidewalk, particularly on major arterial streets like South Promenade Avenue and in other areas where there is no parkway between the curb and sidewalk. [Citation.] Airvacs are just one of many utility-related appurtenances which are commonly situated in sidewalks, including fire hydrants, blow-off valves, traffic signal control boxes, signal light control boxes, utility boxes, signal poles, light poles, and sign poles, at least one of each of which was situated in the vicinity of the Airvac or across the street. [Citation.]

"The Airvac was installed between 1982 and 1986, prior to the installation of the sidewalk. [Citation.] The sidewalk, lighting and landscaping were installed between 1988 and 1990, after the installation of the Airvac, and the design plans for those improvements include a specific notation that the Airvac was not to be relocated. [Citation.] Since at least 2006, the City Standard Drawings for airvacs have specified that the airvacs be painted hunter green. [Citation.] As of the date of the Incident, the Airvac was painted hunter green, consistent with the City Standard Drawings. [Citation.] The Specific Plan and design plans for the public improvements along South Promenade Avenue specify the locations of the street lights, call for trees in the 15' landscaped area north of the sidewalk, and explicitly contemplate that the tree canopies will extend out over the sidewalk, which necessarily results in the trees blocking some of the light from the streetlights. [Citation.]

3

"The Airvac, including its location, size, color and every other physical characteristic, as well as the sidewalk, lighting, landscaping, and every other aspect of the Premises, was constructed in accordance with then-prevailing published City Standard Drawings [citation], the Specific Plan and approved plans for the 1982 – 1986 water infrastructure project [citation], and the approved plans for the 1988 – 1990 street improvement project [citation], all of which were reviewed and approved prior to construction by multiple licensed Civil Engineers, including the City Engineer. [Citation.]

"Prior to [Wheat's] Incident, the City had never received a report or claim of any safety concern, danger, or incident associated with the Premises, the Airvac, or any airvac throughout the City, of which there are approximately 865, including dozens situated in sidewalks, most of which have been in place since the 1980's or 1990's. [Citation.] [Wheat's] claim is the one and only claim the City has ever received relating to someone tripping over any of the numerous airvacs, blow-off valves, and fire hydrants situated in sidewalks through[out] the City."

The City argued that summary judgment should be granted for four reasons. First, the City asserted the airvac did not present a substantial risk of danger. The City explained that the "Airvac had been there for over 30 years, and . . . no one had ever reported tripping over" the airvac. The City asserted the airvac's presence on the sidewalk was "open and obvious, even at night."

4

Second, the City asserted, "There are no standards precluding placement of airvacs in sidewalks. . . . Moreover, airvacs are routinely placed in sidewalks, not just in Corona, but throughout this region." Third, the City contended it "had no prior actual or constructive notice of any danger. Prior to learning of [Wheat's] alleged incident, the City never had any reason to believe that an airvac in a sidewalk posed a substantial risk of injury." Fourth, the City asserted it was protected by design immunity. The City contended, "Everything about the Premises, from the location, shape, and color of the Airvac to the nearby streetlights and landscaping, was reasonably designed and approved by licensed Civil Engineers in accordance with relevant standards. The Airvac actually pre-dated the sidewalk and the nearby homes. When the sidewalk went in years later, a conscious design decision was made to leave the Airvac in place. Such expert decisions may not be second-guessed by lay jurors in subsequent personal injury litigation. Rather, it takes changed physical conditions to lose design immunity, and there have not been any intervening changed physical conditions. The trees were not 'overgrown;' rather, the approved design specifically called for tree canopies to extend out over the sidewalks."

The City provided the declaration of John G. O'Donnell, who was a professional Civil Engineer. O'Donnell was employed by the City from 1998 through 2005. On October 29, 2018 between 7:00 p.m. and 8:00 p.m., O'Donnell visited the site of Wheat's accident. O' Donnell timed his visit so that it would correspond to the amount of light that was available at the time of Wheat's accident. O'Donnell opined that the airvac and lighting did not create a dangerous condition of public property because

(1) there is no history of similar accidents; (2) there is adequate lighting, O'Donnell asserted he could see the airvac, at night, "without difficulty from dozens of feet away" and "[t]here is lighting provided by no fewer than eight (8) modern high-powered overhead streetlights in close proximity, including four at the corners of the nearby intersection of South Promenade and Collett, and four others literally surrounding the Airvac—one to the east and one to the west on the same sidewalk, one across the street and slightly to the west, and one almost directly behind the sidewalk at the end of the Wheeler Circle cul-de-sac"; (3) the dark green color of the airvac made it "easier to see in low light conditions because it contrasts more sharply against the light gray sidewalk"; and (4) anyone exercising due care would have seen and avoided the airvac.

The City also provided the declaration of Nelson D. Nelson, who is the Public Works Director / City Engineer / ADA Coordinator for the City. Nelson is a professional Civil Engineer. Nelson began working for the City in 2008. Nelson agreed with O'Donnell's reasoning and conclusions. Nelson asserted there are 800 to 900 airvacs located in the City and he "never heard any concern of any kind from anyone about any airvac."

The City provided the declaration of Tom Moody, who is the General Manager of the City's Department of Water and Power. Moody began working for the City in 1995. Moody explained that airvacs are "one of many utility-related appurtenances which are commonly situated in sidewalks." Moody declared that Wheat's claim was "the first and only time anyone has ever raised any safety concern about that Airvac, or any airvac throughout the City."

The City provided the declaration of Amy Rich, who is the City's Risk Manager. Rich began working with the City in 2005. Rich reviewed all of the City's incoming tort claims. Based upon Rich's recollection and a search of past claims, Rich determined "no one had ever formally or informally reported any concern relating to an airvac."

The City also provided photographs of the airvac area; the City's Standard Drawing 413; Plans for Assessment District 79-2 and Specific Plan (1982-1986); Improvement Plans for Tract Map 19191-4 (1988-1990); a tract map (1988-1989); City Standard Drawing 413 from the years 1998, 2006, 2012, and 2014; Wheat's responses to the City's special interrogatories; and photographs of airvacs situated on sidewalks in the City of Riverside.

C.    OPPOSITION

Wheat opposed the City's motion for summary judgment. Wheat provided the following facts: "On April 21, 2017, around 9:00 p.m., . . . Wheat was walking near his home on the sidewalk of Promenade [S]treet in Corona, CA. As he was walking westbound, on the north side of the street, he tripped and fell over a dark green valve ('airvac') located in the middle of the sidewalk. The dark green valve is only a few feet tall and was located beneath the shadows of adjacent trees. [Wheat] fell and landed on both elbows, suffering a broken left arm, near the elbow; multiple fractures in his right arm and right elbow; multiple fractures in his right shoulder; and a dislocated right shoulder."

Wheat asserted the airvac constituted a dangerous condition of public property because (1) it was "located in the middle of the sidewalk"; (2) the sidewalk is "along a busy, major arterial street . . . where people frequently walk"; (3) the airvac is "only a few feet tall and is painted dark green," which "makes it especially hard to see, particularly at night"; and (4) the lighting around the airvac is poor because there are trees that cast a shadow on the sidewalk and the closest "streetlight is located on an abutting cul-de-sac, but that light is completely blocked by the trees[, and the] next closest street light is over 100 feet away."

Wheat contended he used due care when utilizing the sidewalk because he was "looking straight ahead and was attentive to his surroundings." Wheat asserted, "Perhaps the most foreseeable use of a sidewalk is that people will walk along it." Wheat contended the City "knew or should have known" about the airvac constituting a dangerous condition because (1) maintenance crews inspected the airvac, which was "located in the middle of the sidewalk"; (2) sometime between 2011 and 2015 the City changed the color of the airvac from yellow to dark green, Wheat asserted the yellow color demonstrated that the City knew the airvac was dangerous; and (3) the City has since relocated the airvac off of the sidewalk, which demonstrated the City "should have known of [the airvac's] dangerousness prior to the accident."

Wheat contended the City failed to establish the applicability of design immunity. Wheat asserted the City did not present evidence "that there was discretionary approval of the plan or design prior to construction." Wheat remarked, "None of the City's experts designed or approved the plans, nor did any have discretion

8

and authority to approve such plans." Alternatively, if the trial court were to find that design immunity had been established, then Wheat contended the City lost its design immunity because (1) a sidewalk was installed around the airvac after the airvac was designed, which was "a significant change from its original design"; and (2) tract homes were built near the airvac.

Wheat provided (1) a photograph of a different airvac in the City that was located in a flowerbed; (2) Wheat's declaration, in which he declared that (a) he "was attentive to [his] surroundings and looking straight ahead" prior to tripping over the airvac, (b) the area around the airvac was not well lit; and (c) the City moved the airvac after Wheat's accident; (3) a 2015 Google Maps street view of the airvac painted dark green; (4) a 2011 Google Maps street view of the airvac painted yellow; (5) a photograph of the airvac; (6) excerpts from the deposition transcript of O'Donnell; and (7) a declaration of Kenneth Alvin Solomon.

The excerpts from O'Donnell's deposition reflect (A) it was "standard practice for many years to have these valves in sidewalks"; (B) O'Donnell believed the airvac was well lit and that the dark green color provided "a good contrast between the light gray sidewalk"; (C) dark green was the standard color for airvacs; (D) O'Donnell believed the dark green airvac was easier to see than a yellow hydrant in the same area; (E) O'Donnell was not aware of any prior incidents in the City involving a person tripping over an airvac or hydrant; and (F) the airvac was moved into a landscaped area after Wheat's accident.

9

Kenneth Alvin Solomon had a Doctor of Philosophy degree in Engineering and did post-doctorate studies in risk-benefit assessment. Solomon was a "professional engineer . . . and a Board-Certified Forensic Examiner." Solomon declared, "The subject airvac that Plaintiff Wheat fell over . . . is not required to be painted hunter green. Although the City of Corona's 2014 updated airvac standard drawing #413 [citation] calls for the airvac to be hunter green, the City of Corona does not [need to] blindly follow standard drawings."

Solomon explained, "Airvacs in the City of Corona, including the subject airvac, have been painted yellow, which further shows that the City of Corona can ultimately determine the color of airvacs when appropriate." Solomon noted there was another airvac approximately 0.3 of a mile from the accident site that was painted yellow, which would be a violation of the 2014 standard. Solomon believed the airvac at-issue would have been easier to see at night if it had been painted yellow, rather than dark green, because "its lighter color would have provided better contrast against its dark surroundings." Solomon opined, "If an airvac is located on a sidewalk, then it should be painted yellow. During the day, a yellow airvac would be open and obvious; and at night, it would be more visible than if it had a darker color like hunter green."

Solomon believed the "airvac constituted a dangerous condition at the time of the subject accident, which was after the end of astronomical twilight . . . . The subject accident area is not well lit, and the subject airvac was not open and obvious at the time of the subject accident." Further, Solomon concluded the City lost any design immunity it may have had because (1) the sidewalk was built after the airvac was installed; (2) in

10

the original 1967 drawing, the airvac had a two-foot high cover/cage around it; and (3) the color of the airvac changed from yellow to dark green.

D.     REPLY

The City replied to Wheat's opposition. The City asserted that Wheat's Google Maps photographs of the yellow airvac were inadmissible. The City contended that Wheat argued the area around the airvac was not well lit, but "stops well short of arguing that it was too dark to see the Airvac. . . . That omission is huge because, if the Airvac was visible—and it unquestionably was based on the City's photos—there is no serious argument that it created a 'substantial risk' when used [with] 'due care.' "

The City also noted that there is generally no duty for a municipality to light its streets. Further, the City highlighted Wheat's failure to provide evidence of any other similar accidents. The City asserted that it is common for airvacs to be painted dark green. The City wrote, "Notably, among the numerous dark green airvacs in sidewalk[s] throughout Riverside, there is one adjacent to the Court of Appeal on the northeast corner of Lime and 12th Street."

In regard to design immunity, the City asserted "the City's Standard Drawings in 2006 and 2012 called for airvacs such as the one in question to be pain[t]ed hunter green and for the metal cage around airvacs to be removed. . . . That it may have been yellow or had a cage around it several years earlier—two points on which [Wheat] adduces no admissible evidence—is of no consequence. The applicable standards were updated and revised, and the Airvac conformed to the standards in effect at the time of the Incident." As to design changes over the past 30 years, the City asserted "those changes were all

11

the product of formal design approval processes, for which the City also enjoys design immunity."

E.      TENTATIVE RULING

On January 29, 2019, the trial court issued a tentative ruling granting the City's motion. The trial court tentatively found that the City met its burden on summary judgment by providing O'Donnell's declaration that reflected (1) "the airvac was constructed in accordance with then prevailing published City Standard Drawings, which effectively set the standard of care in that jurisdiction"; (2) it was not below the standard of care to paint the airvac green; and (3) Wheat's "complaint was the first complaint received regarding an airvac in the City."

The trial court then examined Wheat's evidence. The trial court tentatively found that Wheat failed to demonstrate (A) that it was a negligent or wrongful act for a City employee to paint the airvac green; and (B) that the City had actual or constructive knowledge that the airvac was difficult to see at night.

F.      HEARING

On January 30, the trial court held a hearing on the City's summary judgment motion. Wheat asserted that a City employee committed a negligent or wrongful act by painting the airvac dark green. Wheat pointed to Solomon's declaration reflecting the airvac should have been painted a brighter color. Wheat noted that another airvac, located 0.3 of a mile from the airvac at issue, was painted yellow.

12

The City asserted that its standard drawings set the standard of care; that standard was for airvacs to be painted dark green. The City asserted it met its standard of care by painting the airvac dark green. The City argued, "Mr. Solomon may believe in his heart of hearts that it should have been painted yellow, but Mr. Solomon isn't the standard. The standard is what's written. The standard is what's published, and it's not for Mr. Solomon to say that the standard should be something other than what it is. The standard, ultimately, is the standard." The City contended Wheat failed to identify any standard that had been breached.

Wheat argued that the standard of care was reasonableness. Wheat contended he provided evidence that it was unreasonable for an employee of the City to paint the airvac dark green. In regard to the City's constructive knowledge, Wheat contended, "I think any of us could readily look at this photograph and agree that an inspection at night of this situation would uncover its dangerousness." The City responded that "no one in 30-plus years has ever, ever raised even the slightest hint of a concern that any of these things pose a danger to anybody. 865 of them, 30 years, no complaint, no incidents, no lawsuits, no notice." The trial court took the matter under submission. On February 11, the trial court issued an order granting the City's motion for summary judgment.

## DISCUSSION

Wheat contends the trial court erred by granting summary judgment because triable issues of fact exist concerning whether the airvac constituted a dangerous condition of public property.

13

" 'A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. [Citations.]  The moving party bears the burden of showing the court that the plaintiff "has not established, and cannot reasonably expect to establish, a prima facie case . . . ." [Citation.]'  [Citation.]  '[O]nce a moving defendant has "shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established," the burden shifts to the plaintiff to show the existence of a triable issue; to meet that burden, the plaintiff "may not rely upon the mere allegations or denials of its pleadings . . . but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action." '

" 'On appeal from the granting of a motion for summary judgment, we examine the record de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party.' "  (*Lyle v. Warner Bros. Television Productions* (2006) 38 Cal.4th 264, 274.)

"[A] public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:  [¶]  (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶]  (b) The public entity had actual or constructive notice of the dangerous condition under [Government Code s]ection 835.2 a sufficient time prior to

14

the injury to have taken measures to protect against the dangerous condition." (Gov. Code, § 835.)[1]

We begin with the first element, which is the existence of a dangerous condition. (§ 835.) " 'Dangerous condition' means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." (§ 830, subd. (a).)

Phrased differently, "A condition is not a dangerous condition . . . if the trial or appellate court, viewing the evidence most favorably to the plaintiff, determines as a matter of law that the risk created by the condition was of such a minor, trivial or insignificant nature in view of the surrounding circumstances that no reasonable person would conclude that the condition created a substantial risk of injury when such property or adjacent property was used with due care in a manner in which it was reasonably foreseeable that it would be used." (§ 830.2.) "Except where the doctrine of res ipsa loquitur is applicable, the happening of the accident which results in the injury is not in and of itself evidence that public property was in a dangerous condition." (§ 830.5, subd. (a).)

The first factor within the dangerous condition element is the type of alleged defect. (*Stathoulis v. City of Montebello* (2008) 164 Cal.App.4th 559, 567 (*Stathoulis*).) The alleged defects are the color, height, and location of the airvac. The City's

---

[1] All subsequent statutory references will be to the Government Code unless otherwise indicated.

15

evidence reflects the airvac was dark green, located in the middle of a sidewalk, and approximately two feet tall. Because the airvac was two feet tall, green, and located in an open space it was a noticeable object. The airvac was not hidden, small, or painted the same color as the sidewalk. Therefore, it was an object that one could avoid if one were exercising reasonable care while walking on the sidewalk. The color, height, and location of the airvac reveal a trivial defect because the color, height, and open nature of the airvac cause the airvac to be avoidable when using due care. (§ 830, subd. (a) [dangerous condition means a condition that presents a substantial risk when the property is used with due care].)

The second factor requires us to examine "any additional factors such as . . . lighting and visibility conditions at the time of the accident." (*Stathoulis*, *supra*, 164 Cal.App.4th at p. 567-568.) The City provided the declaration of O'Donnell, who opined that there is adequate lighting to see the airvac at night. O'Donnell asserted that he was able to see the airvac at night "without difficulty from dozens of feet away." O'Donnell declared that there are "no fewer than eight (8) modern high-powered overhead streetlights in close proximity, including four at the corners of the nearby intersection."

O'Donnell declared that he measured the amount of light at the site of the accident, and there was "in excess of one lumen with no car lights . . . and no additional lighting." Wheat's evidence provided a different measurement: Solomon's measurements reflected the lighting in the area of the airvac measured 0.05-foot-candle, which "is much lower than what Mr. O'Donnell measured." Because we are reviewing

16

a grant of summary judgment, we rely upon Solomon's measurement of 0.05-foot-candle. (*Lyle v. Warner Bros. Television Productions*, *supra*, 38 Cal.4th at p. 274 [construe the evidence in favor of the party opposing summary judgment].)

The City's evidence reflects there was adequate lighting to see the airvac at night "from dozens of feet away." Wheat's evidence reflects the airvac (1) "would have been easier to see at night . . . if it were painted yellow, instead of hunter green"; and (2) "would be more visible" if it were painted yellow. Wheat's evidence focuses on the ease of seeing the airvac; it does not reflect the airvac was effectively invisible. Construing the evidence liberally in favor of Wheat, the airvac was visible. Because the evidence reflects the airvac was visible, a person exercising due care could have avoided the airvac. Therefore, the condition of the airvac, in the light available at night, presented a trivial risk of harm to a person exercising due care. (§ 830, subd. (a) [dangerous condition means a condition that presents a substantial risk when the property is used with due care].)

In regard to other airvacs in the City, Nelson, the City's Public Works Director / City Engineer / ADA Coordinator, asserted there are 800 to 900 airvacs located in the City and he "never heard any concern of any kind from anyone about any airvac." Moody, who began working for the City in 1995 and who was the General Manager of the City's Department of Water and Power, declared that Wheat's claim was "the first and only time anyone has ever raised any safety concern about that Airvac, or any airvac throughout the City." Rich, the City's Risk Manager, determined "no one had ever formally or informally reported any concern relating to an airvac." This evidence

17

reflects other people have not been injured as a result of the 800 to 900 airvacs located in the City. The large quantity of airvacs combined with the lack of injuries provides further support for the conclusion that the airvac did not present a substantial risk of injury. (See *Huckey v. City of Temecula* (2019) 37 Cal.App.5th 1092, 1109-1110 [the risk of injury must be substantial; some risk is insufficient].)

We now turn to Wheat's evidence to examine whether he demonstrated that the airvac presented a substantial risk of harm when due care was being exercised. Wheat's evidence reflects the airvac was painted dark green, while an airvac 0.3 of a mile away was painted yellow. Wheat's evidence also reflects the airvac was approximately 26.5 inches tall. Solomon declared the airvac would have been easier to see if it had been painted yellow rather than dark green. Wheat's evidence is not persuasive because it does not explain why the dark green color would cause the airvac to be nearly invisible, such that a person exercising due care could not avoid the green airvac. Instead, Wheat's evidence demonstrates that yellow would be a preferable color. Because evidence has not been provided to demonstrate that the green color created a substantial risk of harm when due care was being exercised, we are not persuaded that the color of the airvac could be found to constitute anything more than a trivial defect.

Next, we examine additional factors, such as lighting. Wheat's evidence reflects the location of the airvac "is not well lit." Solomon's measurements reflected the lighting in the area of the airvac measured 0.05-foot-candle, which "is much lower than what Mr. O'Donnell measured." The flaw in Wheat's evidence is that it fails to establish that the airvac was not visible due to the lack of lighting. Wheat's evidence

18

indicates that there was low lighting in the area, but does not demonstrate that a person exercising due care would be unable to see the airvac. In other words, low lighting does not lead to the conclusion that the airvac was not visible. Accordingly, the condition of the airvac—the color, location, height, and surrounding lighting—presented a trivial (not substantial) risk of injury. The trial court did not err by granting summary judgment.

Wheat asserts the risk presented by the airvac was not trivial because "plaintiff was walking in the middle of the sidewalk, looking straight ahead and was attentive to his surroundings. [Citation.] By walking in the middle of the sidewalk and looking at where he was walking, [Wheat] was acting as a reasonably prudent pedestrian." Wheat's argument is unpersuasive because he cannot rely solely on his own accident to establish that the airvac presented a substantial risk of danger. (§ 830.5, subd. (a).)

At oral argument in this court, Wheat contended his best evidence is a Google Maps Street View photograph of the sidewalk, airvac, and hydrant. Wheat asserted the photograph showed that his client was able to avoid the yellow hydrant but not the green airvac. There are two problems with Wheat's argument. First, the photograph does not establish that Wheat was walking from the yellow hydrant toward the green airvac. In Wheat's declaration, he referred to photographs taken by his daughter on April 24, 2017, which were allegedly attached to his declaration, and declared, "I was walking in the direction from the bottom of the photo to the top of the photo—the same direction that the photographer would be facing." There are no photographs attached to Wheat's declaration, so we cannot compare them to the Google Maps Street View

19

photograph. We found two photographs elsewhere in the record that are listed as being taken on April 24, 2017. The photographs are marked "best copy available." One is nearly all black with only a few spots of white. The second is mostly black, although a fire hydrant can be seen. It is unclear (A) if these are the photographs to which Wheat was referring; and (B) if these are the photographs to which Wheat was referring, what exactly Wheat was able to see in the photographs (before they were copied) that would assist us in determining the direction he was walking.

Second, the Google Maps Street View photograph does not indicate it is a photograph of the accident site and we were not directed to an associated declaration authenticating the Google Maps Street View photograph. (Evid. Code, § 1400.) Due to the foregoing issues, we are not persuaded by Wheat's reliance on the Google Maps Street View photograph.

At oral argument in this court, Wheat asserted that the dangerous condition was the sidewalk—not the airvac. Wheat contended, "The location of the valve renders the City's sidewalk dangerous because it obstructed the pathway of those walking. Therefore, the issue in this case is whether the location of the two feet, dark green, metal valve, near the center of the sidewalk, underneath the hanging trees, at night, presented a dangerous condition rendering the sidewalk dangerous." We understand Wheat's argument as asserting that we should focus on a sidewalk with an airvac, as opposed to an airvac in a sidewalk. This appears to be an issue of semantics because Wheat failed to explain how the result in this case would be different if one focused on a sidewalk with an airvac, rather than an airvac in a sidewalk.

20

In sum, Wheat failed to meet his burden of establishing a triable issue of material fact on the existence of a dangerous condition. We conclude the trial court did not err.

We note that in *Stathoulis*, the appellate court listed a third factor for analyzing whether a risk was substantial or trivial. The appellate court wrote, "If, as here, the landowner is a public entity, the court must also determine whether the defect was conspicuous enough to place the entity on notice. (§ 835.)" (*Stathoulis*, *supra*, 164 Cal.App.4th at p. 568.) In our view, notice is a separate issue from whether a condition of public property constitutes a substantial or trivial risk. We see the elements as separate because in section 835 notice is expressly set forth as a separate element. The statute provides that a dangerous condition exists when, among other things, (1) "the plaintiff establishes that the property was in a dangerous condition at the time of the injury" and (2) "[t]he public entity had actual or constructive notice of the dangerous condition." (§ 835.)

The appellate court in *Antenor v. City of Los Angeles* (1985) 174 Cal.App.3d 477, 482, quoting another case wrote, " 'Our analysis of the cases in this field, despite some overlapping language, persuades us that the correct approach in cases of this nature is to determine first if the claimed defect is too trivial, as a matter of law, to be dangerous. An inquiry into this issue is a logical preliminary step before reaching the larger question of . . . notice.' " Thus, the *Antenor* court also separated the issue of notice from the issue of substantial/trivial risk. In sum, we will not address the issue of notice within our analysis of substantial/trivial risk.

21

Because we have concluded there is not a triable issue of fact concerning the dangerous condition/substantial risk element, we do not address the additional arguments raised by Wheat pertaining to other aspects of the dangerous condition cause of action, i.e., notice and design immunity.  (*Schoshinski v. City of Los Angeles* (2017) 9 Cal.App.5th 780, 791 [courts will only decide actual controversies].)

## DISPOSITION

The judgment is affirmed.  Respondent is awarded its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


MILLER _____
                                                                                            J.


We concur:


RAMIREZ _____
                              P. J.


McKINSTER _____
                              J.