Filed 4/30/26  Rigali v. Pelican Products CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MONICA RIGALI, Plaintiff and Respondent, v. PELICAN PRODUCTS, INC. et al., Defendants and Appellants. | B342737 (Los Angeles County Super. Ct. No. 24TRCV00980) |

APPEAL from an order of the Superior Court of Los Angeles County, Ronald F. Frank, Judge.  Affirmed.

Littler Mendelson, Alaya B. Meyers, Kimberly M. Shappley and Michael L. Kibbe for Defendants and Appellants.

Sparrow Law Group, Joubin Hanassab, Nikka Maleki; Schein Law Group and Josh Schein for Plaintiff and Respondent.

————————————

## INTRODUCTION

Appellants Pelican Products, Inc. (Pelican) and its parent entity, Platinum Equity Advisors, LLC (Platinum) challenge the trial court's denial of their motion to compel arbitration of employment-related claims asserted by former Pelican employee Monica Rigali. Those claims included one for hostile work environment sexual harassment, which the trial court held it could not compel to arbitration given the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (EFAA; 9 U.S.C. §§ 401-402).[1] Concluding that Rigali had alleged a plausible sexual harassment claim, the court also found the predispute arbitration agreement she entered was unenforceable under the EFAA with respect to her entire case, including her nonsexual harassment claims.

Appellants contend that Rigali has not stated a plausible sexual harassment claim and that the EFAA thus does not apply. Assuming Rigali did plead a plausible sexual harassment claim, appellants alternatively contend that the EFAA voids the parties' arbitration agreement only as to that sexual harassment claim and not Rigali's other claims.

We recently addressed the scope of the EFAA in *Liu v. Miniso Depot CA, Inc.* (2024) 105 Cal.App.5th 791 and concluded that the plain language of the statute exempts a plaintiff's entire case from arbitration where he or she asserts at least one sexual harassment claim subject to the act. (*Id.* at p. 802.) No post-*Liu* decision has disagreed with that interpretation, the weight of both California and other authority continues to support *Liu*'s

---

[1] All unspecified statutory references are to title 9 of the United States Code.

reasoning, and appellants fail to identify any reason to depart from our prior precedent. In *Liu*, we did not reach the issue of what scrutiny, if any, a court should apply to determine whether a plaintiff sufficiently alleges a sexual harassment claim in order for the EFAA to apply. We again do not need to reach this issue because Rigali's claim for sexual harassment meets the standard appellants espouse.

Accordingly, we affirm the trial court's ruling denying appellants' motion to compel arbitration.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Rigali's Lawsuit

On March 21, 2024, Rigali filed a complaint against Pelican, Platinum, and individuals James Curleigh, Kevin Miniard, Jeffrey Goldberg, and Philip Gyori. Rigali alleged that the individual defendants were "owner[s], supervisor[s], agent[s] and/or employee[s]" of the two entities.[2] On April 19, 2024, Rigali filed the operative first amended complaint against the same defendants.

The operative complaint alleges that Pelican "is a large product design and manufacturer" which "is managed by a group of roughly [10] executives, the vast majority of which are male." In April 2023, Rigali, "an experienced marketing and branding executive," was hired as Pelican's senior vice president of marketing and product development, working under Pelican's chief executive officer (CEO) Gyori. "Pelican's male executives engage[d] in inappropriate, threatening, and harassing conduct

---

[2] None of the individual defendants is a party to this appeal.

3

towards women, including [Rigali]." (Capitalization omitted.) Around May 2023, "male executives spread a false rumor that [Rigali] was involved in the 'Me Too' Movement during her tenure as a Nike employee." Because of Rigali's gender, Miniard, who was Pelican's chief operating officer, "constantly undermined [her] input, talked down to her, and treated her as his subordinate, though their positions were equivalent." Around June 2023, at an executive team dinner, "Miniard instructed [Rigali] to begin checking with him before signing anything on behalf of Pelican. When [Rigali] reminded . . . Miniard that they were peers, . . . Miniard, who had been drinking, raised his voice and repeatedly yelled at [Rigali] not to move forward on a particular project without his approval." (Capitalization omitted.)

Rigali complained to Pelican's human resources department (HR) about her exchange with Miniard and the rumors regarding her time at Nike; Rigali reported to HR that "Miniard harasse[d] her, bullie[d] her, and treat[ed] her as his subordinate because she is a woman." (Capitalization omitted.) When Gyori learned of Rigali's complaint to HR, he suggested to Rigali that maybe she had " 'step[ped] into [Miniard]'s lane' " and that " '[Miniard] probably had a little courage on board because he had been drinking.' "

Also in June 2023, "Gyori shared with [Rigali] sexually explicit content from an Instagram page . . . which features women in revealing clothing posing on [another company's products], and told [Rigali] that this content is '*good marketing*.' In an executive meeting the next month, the content was projected onto the big screen in the main conference room in [Rigali]'s presence." (Capitalization omitted.)

During a tour of Pelican's factory, "Gyori listed the names of injection molding machines like 'Thor' and 'King Kong.' When [Rigali] asked if any of the machines have women's names, . . . Gyori pointed to the smaller machines in the back of the factory and stated" they were named for the ex-girlfriends of Pelican's founder. (Capitalization omitted.)

Around October 2023, "[Rigali] became informed of a sexual relationship between one of Pelican's male executives and his female subordinate." (Capitalization omitted.)

Around November 2023, during a business trip to Asia, "Goldberg told [Rigali], 'Did you know Genghis Khan had 1,400 children? . . . Don't you know what the word 'fuck' means? The word 'fuck' means Fornication Under Consent of the King. Fornication Under Consent of the King means Genghis Khan could fuck whoever he wanted.' [Rigali] was offended by the comments, and understood them to mean that . . . Goldberg was suggesting that the male executives, like 'kings,' could have a sexual relationship with any female employees of their choosing." (Capitalization, boldface and italics omitted.) During the trip Goldberg also referred to Rigali as a " 'cunt' " to their colleagues, and "constantly screamed 'blow me!' when trying to make a point." (Italics omitted.) Goldberg also "told [Rigali] that having daughters is a 'punishment, because if I have daughters, I have to worry about all the penises in the world, and if I have a son, I only have to worry about one,' " and "described his ex-wife's affair in intimate detail."

In around mid-November 2023, "after hearing that . . . Goldberg had been disparaging her to her colleagues, [Rigali] complained to her supervisor, . . . Curleigh, about . . . Goldberg's conduct" (capitalization omitted), and later that month she

complained to HR about Goldberg's behavior on the trip to Asia. Pelican terminated Goldberg around December 2023, "after several employees came forward and described his ongoing inappropriate conduct, including his sexually harassing behavior."

"[Rigali]'s complaints led to a campaign of retaliation and further harassment against [her], and specifically by the other male executives. In January of 2024, . . . Curleigh began placing unwarranted scrutiny on [Rigali]'s work product and repeatedly questioned [Rigali] about her time as a female Nike employee during the 'Me Too' Movement." (Capitalization omitted.) In February 2024, "Curleigh, . . . Miniard, and the other male executives coordinated to create pretextual performance issues to pin on [Rigali], deceitfully stating that they had not been kept up to date on [Rigali]'s projects." (Capitalization omitted.) In a meeting later that month, Curleigh criticized Rigali, "told [her] . . . that people 'do not like' her" (italics omitted), and "repeatedly asked [her] what she want[ed] to do, 'knowing the relationship dynamics on the executive leadership team,' which he blamed on [Rigali], pressuring her to resign."

Rigali was terminated around February 20, 2024, "based on pretextual reasons." "Pelican employees left positive reviews regarding [Rigali]'s good performance on [her] LinkedIn profile. On or around March 20, 2024, [d]efendants approached said employees and instructed them to remove their positive reviews, as further retaliation against [Rigali]."

Based on these allegations, Rigali asserted causes of action for (1) hostile work environment sexual harassment in violation of the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.), (2) discrimination on the basis of

sex/gender in violation of FEHA, (3) failure to prevent discrimination, harassment and/or retaliation in violation of FEHA, (4) retaliation in violation of FEHA, (5) whistleblower retaliation (Lab. Code, § 1102.5), (6) wrongful termination in violation of public policy, (7) intentional infliction of emotional distress, (8) defamation, (9) breach of implied-in-fact contract not to terminate employment without good cause, and (10) breach of covenant of good faith and fair dealing.  Rigali also asserted a cause of action for declaratory relief regarding a bonus she alleged Pelican promised her.

## B.     The Motion to Compel Arbitration

On May 28, 2024, appellants moved to compel arbitration of all of Rigali's claims under the Federal Arbitration Act (FAA; § 1 et seq.).  Pelican relied on an arbitration agreement Rigali had signed electronically when she began her employment at Pelican and contended that Rigali's claims fell within the agreement's scope.[3]  Appellants asserted that the FAA applied because the arbitration agreement invoked the FAA and because Pelican's operations involved interstate commerce.

Anticipating Rigali's reliance on the EFAA, appellants argued that the act did not apply because Rigali failed to allege a claim for sexual harassment that could survive a motion to dismiss under the federal "plausibility" standard.  Appellants alternatively contended that if the act did apply it would only

---

[3] Rigali does not contend on appeal that no valid arbitration agreement existed or that her claims were not encompassed within the scope of the agreement.  Accordingly, we do not discuss these issues further.

7

render the arbitration agreement unenforceable as to Rigali's sexual harassment claim.

Rigali's opposition contended that she had alleged a plausible claim for sexual harassment and the EFAA rendered the arbitration agreement unenforceable. Rigali further contended that, under the EFAA, the arbitration agreement was unenforceable as to all of her claims, not just those claims involving allegations of sexual harassment.

## C.    The Trial Court's Ruling

On October 9, 2024, the trial court denied appellants' motion to compel arbitration. The court found the arbitration agreement was unenforceable under the EFAA because Rigali had alleged a plausible cause of action for sexual harassment. It further held the EFAA exempted Rigali's entire case, including her nonsexual harassment claims, from arbitration.

Appellants timely appealed. (Code Civ. Proc., § 1294, subd. (a) ["An order dismissing or denying a petition to compel arbitration" is appealable].)

## DISCUSSION

## A.    Standard of Review

In deciding a motion to compel arbitration, "the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972.) But " 'where the trial court's denial of a petition to arbitrate presents a pure question of law, we review the order de novo.' " (*Mendez v. Mid-Wilshire Health Care Center* (2013) 220 Cal.App.4th 534, 541.) In addition, "[i]t is the ruling, and not the reason for the

8

ruling, that is reviewed on appeal." (*Muller v. Fresno Community Hospital & Medical Center* (2009) 172 Cal.App.4th 887, 906-907.)

## B.    The FAA and EFAA

Appellants contend that the FAA governs the parties' arbitration agreement and Rigali does not argue otherwise. As relevant here, the FAA provides, "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4." (§ 2.)

The EFAA became effective on March 3, 2022, before appellants hired Rigali. It added to the FAA the "chapter 4" just referenced in the above quote, and consists of sections 401 and 402. Section 402 provides, in relevant part, "Notwithstanding any other provision of this title, at the election of the person alleging conduct constituting a sexual harassment dispute . . . , no predispute arbitration agreement . . . shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the . . . sexual harassment dispute." (§ 402(a).) Section 401 defines " 'predispute arbitration agreement' " as "any agreement to arbitrate a dispute that had not yet arisen at the time of the making of the agreement." (§ 401(1).) In addition, it defines " 'sexual harassment dispute' " as "a dispute relating to conduct that is alleged to constitute sexual harassment under applicable Federal, Tribal, or State law." (§ 401(4).)

9

A court (as opposed to an arbitrator) decides the applicability of the FAA, and federal law governs that decision. (§ 402(b).)

## C.     The EFAA Applies Based on Rigali's Claim for Sexual Harassment

Appellants first contend that the EFAA only applies where a plaintiff alleges a plausible sexual harassment claim sufficient to survive a motion to dismiss under rule 12(b)(6) of the Federal Rules of Civil Procedure. They rely on federal district court decisions which have adopted this standard. (See, e.g., *Yost v. Everyrealm, Inc.* (S.D.N.Y. 2023) 657 F.Supp.3d 563, 586, 588; *Mitura v. Finco Services, Inc.* (S.D.N.Y. 2024) 712 F.Supp.3d 442, 451-452.) Rigali does not dispute that this standard applies and contends that she plausibly pleads sexual harassment claims. Assuming without deciding that appellants are correct a state court should apply the federal motion to dismiss standard, Rigali's claim for sexual harassment satisfies that pleading standard.[4]

---

[4] In *Liu* we did not decide "what threshold, if any, a plaintiff's sexual harassment related claims must meet before the EFAA becomes applicable" because the parties did not dispute that the plaintiff had alleged viable sexual harassment claims. (*Liu v. Miniso Depot CA, Inc.*, *supra*, 105 Cal.App.5th at p. 800, fn. 2.) We are not aware of any California case which has expressly addressed this issue. In *Quilala v. Securitas Security Services USA, Inc.* (2025) 117 Cal.App.5th 75, the court applied the plausibility standard without discussing whether it was required. (*Id.* at pp. 86-87 [concluding, "the trial court correctly determined that [the plaintiff's] allegations stated a plausible claim of sexual harassment . . . bringing the dispute within the

10

1. *Federal Motion to Dismiss Standard*

*Yost* held that a plaintiff's claim must meet the federal "plausibility" standard articulated in *Bell Atl. Corp. v. Twombly* (2007) 550 U.S. 544, 570 [127 S.Ct. 1955, 167 L.Ed.2d 929] and *Ashcroft v. Iqbal* (2009) 556 U.S. 662, 678 [129 S.Ct. 1937, 173 L.Ed.2d 868] in order for the EFAA to apply. (*Yost v. Everyrealm, Inc., supra*, 657 F.Supp.3d at pp. 577, 585.) Under that standard, "a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' [Citation.] A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' [Citation.] A complaint is properly dismissed where, as a matter of law, 'the allegations in a complaint, however true, could not raise a claim of entitlement to relief.' [Citation.] When resolving a motion to dismiss, the [c]ourt must assume all well-pleaded facts to be true, 'drawing all reasonable inferences in favor of the plaintiff.' [Citation.] That tenet, however, does not apply to legal conclusions. [Citation.] Pleadings that offer only 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " (*Id.* at p. 577.)

2. *Sexual Harassment under FEHA*

"The express purpose of FEHA is to provide effective remedies that will eliminate discriminatory practices in the

---

scope of the EFAA"].) At least one federal district court has adopted a different standard, concluding "that a plaintiff need only plead nonfrivolous claims relating to sexual assault or to conduct alleged to constitute sexual harassment." (*Diaz-Roa v. Hermes Law, P.C.* (S.D.N.Y. 2024) 757 F.Supp.3d 498, 533.)

11

workplace ([Gov. Code, ]§ 12920), and its provisions 'are to be construed broadly and liberally' to accomplish that purpose." (*Bailey v. San Francisco Dist. Attorney's Office* (2024) 16 Cal.5th 611, 626.)

FEHA makes it unlawful for an employer to "harass an employee" "because of [their] . . . sex, gender, gender identity, gender expression, . . . [or] sexual orientation." (Gov. Code, § 12940, subd. (j)(1).) Harassment claims focus "on situations in which the *social environment* of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 706.) "[T]he prohibition against sexual harassment includes protection from a broad range of conduct, ranging from expressly or impliedly conditioning employment benefits on submission to or tolerance of unwelcome sexual advances, to the creation of a work environment that is hostile or abusive on the basis of sex." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 461.) "Sexually harassing conduct need not be motivated by sexual desire." (Gov. Code, § 12940, subd. (j)(4)(C).)

" '[T]o prevail, an employee claiming harassment based upon a hostile work environment must demonstrate that the conduct complained of was *severe enough or sufficiently pervasive* to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees *because of their sex.*' " (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 278-279 (*Lyle*).)

" 'Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment' " is not actionable under FEHA, but under this standard " 'the harassing

conduct [need not] lead[] to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers.' " (*Bailey v. San Francisco Dist. Attorney's Office, supra,* 16 Cal.5th at p. 628, quoting *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 22 [114 S.Ct. 367, 126 L.Ed.2d 295].) "[I]n a workplace harassment suit '. . . [i]t suffices to prove that a reasonable person subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to make it more difficult to do the job.' " (Gov. Code, § 12923, subd. (a).) The Legislature has declared, "A single incident of harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if the harassing conduct has unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment." (*Id.*, § 12923, subd. (b); see also *Beltran v. Hard Rock Hotel Licensing, Inc.* (2023) 97 Cal.App.5th 865, 878 [enactment of Gov. Code, § 12923 lowered the "bar for plaintiffs to clear" in proving " 'severe or pervasive' harassment"].)

" 'The working environment must be evaluated in light of the totality of the circumstances.' [Citation.] ' "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ' [Citation.] ' "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." ' " (*Bailey v. San*

13

*Francisco Dist. Attorney's Office, supra*, 16 Cal.5th at p. 628.) "In determining the severity of harassment, '[t]he United States Supreme Court has warned that the evidence in a hostile environment sexual harassment case should not be viewed too narrowly: "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' [Citation.] . . . [T]hat inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. . . . The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensibility to social context, will enable courts and juries to distinguish between simple teasing or roughhousing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." ' " (*Lyle, supra*, 38 Cal.4th at p. 283.) "Generally, . . . sexual conduct that involves or is aimed at persons other than the plaintiff is considered less offensive and severe than conduct that is directed at the plaintiff." (*Id.* at p. 284.)

A plaintiff suing her employer "must establish the offending conduct was imputable to her employer." (*Lyle, supra*, 38 Cal.4th at p. 279.) "Harassment of an employee . . . by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." (Gov. Code, § 12940, subd. (j)(1).)

14

3. *Rigali Has Alleged a Plausible Sexual Harassment Claim*

Appellants contend that the conduct alleged in the complaint, even when all inferences are drawn in Rigali's favor, was not severe enough or sufficiently pervasive to constitute a hostile work environment as a matter of law. We disagree.

Rigali alleges in general terms that her male colleagues "engage[d] in inappropriate, threatening, and harassing conduct towards women, including [Rigali]." She also makes more specific allegations. Soon after Rigali joined Pelican, male executives spread a false rumor that she was involved in the #MeToo Movement at a previous job. Miniard "constantly undermined [her] input, talked down to her, and treated her as his subordinate, though their positions were equivalent," and yelled at her during a dinner for the executives. When Rigali complained, Gyori (Pelican's CEO) minimized Miniard's conduct. On a work trip Goldberg referred to Rigali as a " 'cunt,' " spoke to Rigali about sexual matters (with the reasonable inference being that Goldberg's discussion was unwelcome), and used sexual language that included descriptions of sex acts. Goldberg was terminated based on complaints about his behavior, including alleged sexual harassment. Gyori showed Rigali "sexually explicit content" which he described as " 'good marketing' " (italics omitted) and which was later projected onto a large screen in a conference room in Rigali's presence.[5]

_____

[5] Appellants minimize Rigali's allegation that Gyori showed her sexualized images by suggesting that the use of "scantily clad women [is] a frequent marketing tool." However, we must accept at true Rigali's allegation that the material was "sexually

15

These allegations state a viable sexual harassment claim under FEHA under the federal "plausibility" standard. Viewed as a whole, the alleged conduct was severe and pervasive. Rigali alleges that she was subjected to a hostile environment based on her gender, including being called the c-word, being demeaned in work interactions and being yelled at during a team dinner, and being subjected to unwanted talk about sexual acts and sexually explicit images. Rigali has plausibly alleged discriminatory conduct " 'that . . . so altered working conditions as to make it more difficult to do the job.' " (Gov. Code, § 12923, subd. (a).)

The inquiry into whether a working environment is hostile or abusive enough to be actionable is context-specific and often requires a nuanced assessment of the participants' behavior and interactions that is difficult to undertake at the pleading stage. (See *Lyle, supra,* 38 Cal.4th at p. 283; see also Gov. Code, § 12923, subd. (e) ["Harassment cases are rarely appropriate for disposition on summary judgment . . . [because] hostile working environment cases involve issues 'not determinable on paper' "].) It is thus unsurprising that appellants cite no case where a court has dismissed or sustained a demurrer to a sexual harassment claim at the pleading stage based on allegations similar to those Rigali makes here. The only motion to dismiss or demurrer case they do cite, *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, is distinguishable. There, the court concluded the plaintiff failed to state a claim for a hostile work environment based on sexual harassment because any alleged actionable

---

explicit" and must draw the reasonable inference that Gyori was not displaying the material because doing so was necessary to formulate Pelican's own marketing.

misconduct was not directed at her[6] and she had not alleged she had been personally exposed to the conduct.  The Court of Appeal granted the plaintiff leave to amend "to plead sufficient facts to establish a nexus between the alleged sexual harassment of others, her observation of that conduct and the work context in which it occurred."  (*Id.* at pp. 605, 612-613.)  In contrast, Rigali alleges conduct directed at her and that she was personally exposed to behavior directed at others.

Appellants otherwise cite cases involving summary judgment rulings (or, in one case, review of a jury's verdict) which in any event do not involve allegations similar to those at issue here.  (E.g., *Lyle*, *supra*, 38 Cal.4th at pp. 272, 286-287 [summary judgment; court relied on "undisputed" evidence that "none of the . . . offensive conduct involved or was aimed at [the plaintiff]" and the circumstances of the conduct (discussions related to developing script ideas for a television show which used sexual humor) showed it was not directed at women in general and "was neither surprising nor unreasonable from a creative standpoint"]; *Herberg v. California Institute of the Arts* (2002) 101 Cal.App.4th 142, 147-148, 153 [summary judgment; the defendant art school was not liable for sexual harassment based on one incident in which the school displayed for several hours a drawing by two students which depicted one of the plaintiffs and other school employees naked and engaged in sexual acts where "it [wa]s undisputed that the drawing was not intended to harass [the] plaintiffs, but rather to make a point about representational art"

---

[6] The plaintiff had alleged some sexual harassment directed at her but that conduct was time-barred.  (*Fisher v. San Pedro Peninsula Hospital*, *supra*, 214 Cal.App.3d at p. 614, fn. 9.)

17

(fn. omitted)]; *Vasquez v. County of Los Angeles* (9th Cir. 2003) 349 F.3d 634, 639, 644 [summary judgment; "[t]he allegedly harassing incidents . . . occurred over the course of more than one year and only two . . . contained racially related epithets"]; *Manatt v. Bank of America, NA* (9th Cir. 2003) 339 F.3d 792, 796, 798-799 [summary judgment; the plaintiff's coworkers directed "racially insensitive 'humor' " at the plaintiff only twice "over a span of two-and-a-half years"]; *Kortan v. California Youth Authority* (9th Cir. 2000) 217 F.3d 1104, 1106, 1110, 1111 [summary judgment; the alleged offensive comments by the plaintiff's supervisor were not about the plaintiff and were "concentrated on one occasion"].)

Rigali contends other causes of action she has asserted, including her retaliation and termination claims, also constitute "sexual harassment dispute[s]" under section 401 that exempt her case from arbitration. We need not address those other claims given the plausibility of her hostile work environment claim because, as we next explain, Rigali's hostile work environment claim renders the parties' arbitration agreement unenforceable with respect to all of her claims.

## D. The EFAA Makes the Parties' Arbitration Agreement Unenforceable as to Rigali's Entire Case

Appellants contend that if the EFAA applies, the act only renders the parties' arbitration agreement unenforceable with respect to Rigali's sexual harassment claims and her nonsexual harassment claims must still be arbitrated. We rejected this precise argument in *Liu* and held that, under the plain language of the EFAA, where the act applies to at least one of the plaintiff's claims it applies to all of her claims. (*Liu v. Miniso Depot CA, Inc.*, *supra*, 105 Cal.App.5th at p. 800.) Our conclusion

18

was consistent with the only published appellate decision on the issue at the time, *Doe v. Second Street Corp.* (2024) 105 Cal.App.5th 552. Since *Liu*, two other published California appellate decisions have reached the same conclusion. (*Quilala v. Securitas Security Services USA, Inc.*, *supra*, 117 Cal.App.5th at p. 88 ["The [EFAA]'s plain language makes clear that the exemption applies to the case, not individual claims, where a plaintiff alleges conduct constituting sexual harassment or sexual assault" (italics omitted)]; *Casey v. Superior Court* (2025) 108 Cal.App.5th 575, 588 ["where a plaintiff's lawsuit contains at least one claim that fits within the scope of the EFAA, 'the arbitration agreement is unenforceable as to all claims asserted in the lawsuit' "].)

None of appellants' arguments gives us a reason to reconsider *Liu*. Most of them reiterate claims we already rejected in *Liu* such that we need not repeat them here. Appellants' only new contention is that interpreting the EFAA to apply to an entire case when at least one cause of action alleges sexual harassment contravenes "[t]he 'principal purpose' of the FAA . . . to 'ensur[e] that private arbitration agreements are enforced according to their terms.' " (*AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 344 [131 S.Ct. 1740, 179 L.Ed.2d 742]). But "[l]ike any statutory directive," the FAA's policy favoring arbitration "may be overridden by a contrary congressional command." (*Shearson/American Express Inc. v. McMahon* (1987) 482 U.S. 220, 226 [107 S.Ct. 2332, 96 L.Ed.2d 185].) Congress expressly incorporated the EFAA into the FAA by amending section 2—which expresses the FAA's purpose to enforce the contractual rights and expectations of the parties to an arbitration agreement—to make that section subject to the

19

EFAA. Thus, section 2 now provides (with the new language italicized) that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract *or as otherwise provided in chapter 4* [the EFAA provisions]." (§ 2, italics added.) Thus, it does not contravene the FAA's purpose to interpret the EFAA (which is now part of the FAA itself) to render an arbitration agreement unenforceable with respect to a plaintiff's entire case where at least one claim constitutes "a sexual harassment dispute" under the EFAA.[7]

Because the EFAA prohibits compelling Rigali to arbitrate any of her claims, we need not address appellants' contention that we should stay any claims not ordered to arbitration.

---

[7] Appellants relatedly rely on the United States Supreme Court's direction to construe exemptions to arbitration narrowly. (*Circuit City Stores, Inc. v. Adams* (2001) 532 U.S. 105, 118-119 [121 S.Ct. 1302, 149 L.Ed.2d 234]). This policy does not and cannot justify disregarding the EFAA's plain statutory language. (See *id.* at pp. 118-119 [applying policy of "narrow construction" to reject "an expansive construction of the FAA's exclusion provision that goes beyond the meaning of the words Congress used"].)

## DISPOSITION

The trial court's order denying appellants' motion to compel arbitration is affirmed.  Rigali is awarded her costs on appeal.

NOT TO BE PUBLISHED


WEINGART, J.


We concur:



ROTHSCHILD, P. J.



BENDIX, J.